# STATE OF WEST VIRGINIA
## SUPREME COURT OF APPEALS

**Dennis Rydbom,**
**Petitioner Below, Petitioner**

**vs)   No. 17-0068** (Wood County 00-P-62)

**Donnie Ames, Superintendent,**
**Mt. Olive Correctional Complex,**
**Respondent Below, Respondent**

**FILED**

**December 20, 2019**

EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

## MEMORANDUM DECISION

Petitioner Dennis Rydbom, pro se, appeals the December 22, 2016, order of the Circuit Court of Wood County denying his petition for a writ of habeas corpus. Respondent Donnie Ames, Superintendent, Mt. Olive Correctional Complex,[1] by counsel Caleb A. Ellis, filed a response in support of the circuit court's order. Petitioner filed a reply.

The Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

On February 6, 1998, petitioner was convicted by a jury in the Circuit Court of Wood County of first-degree murder. The circuit court sentenced petitioner to a life term of incarceration without the possibility of parole. On June 1, 1999, this Court refused petitioner's criminal appeal. Following his appeal, petitioner initiated the instant proceeding challenging his conviction on May 24, 2000, by filing a petition for a writ of habeas corpus in the circuit court. Though petitioner was initially appointed habeas counsel, the case laid dormant from 2003 to 2007.

---

[1]Since the filing of the appeal in this case, the superintendent at Mt. Olive Correctional Complex has changed and the superintendent is now Donnie Ames. The Court has made the necessary substitution of parties pursuant to Rule 41(c) of the West Virginia Rules of Appellate Procedure. Additionally, effective July 1, 2018, the positions formerly designated as "wardens" are now designated "superintendents." *See* W. Va. Code § 15A-5-3.

On May 3, 2007, petitioner filed a petition for a writ of mandamus in this Court due to the dormancy of his habeas case. This Court dismissed the mandamus petition on October 22, 2007, following the resumption of activity in the habeas proceeding.[2] Eventually, petitioner proceeded in the habeas case pro se with standby counsel. The circuit court held the omnibus hearing on November 9, 2016. Petitioner raised numerous issues, including the ineffective assistance of trial counsel, under ten general categories: (1) violation of petitioner's speedy trial rights; (2) denial of both petitioner's right to represent himself and his right to counsel; (3) unconstitutional searches and seizures; (4) denial of petitioner's right to a fair trial given the admission of pieces of underwear allegedly belonging to the victim; (5) denial of petitioner's right to a fair trial due to the extensive participation by the State of Ohio in the West Virginia criminal prosecution;[3] (6) improper admission of hearsay evidence; (7) violation of petitioner's right against self-incrimination; (8) prejudicial pretrial publicity; (9) biased judge; and (10) cumulative error. On December 22, 2016, the circuit court entered a comprehensive order rejecting petitioner's grounds for relief and denying the habeas petition. Petitioner now appeals the circuit court's December 22, 2016, order denying habeas relief.

In Syllabus Point 1 of *Anstey v. Ballard*, 237 W. Va. 411, 787 S.E.2d 864 (2016), we held:

> "In reviewing challenges to the findings and conclusions of the circuit court in a habeas corpus action, we apply a three-prong standard of review. We review the final order and the ultimate disposition under an abuse of discretion standard; the underlying factual findings under a clearly erroneous standard; and questions of law are subject to a *de novo* review." Syl. Pt. 1, *Mathena v. Haines*, 219 W. Va. 417, 633 S.E.2d 771 (2006).

*See also* Syl. Pt. 1, *State ex rel. Postelwaite v. Bechtold*, 158 W.Va. 479, 212 S.E.2d 69 (1975) (holding that "[f]indings of fact made by a trial court in a post-conviction habeas corpus proceeding will not be set aside or reversed on appeal by this Court unless such findings are clearly wrong").

On appeal, petitioner argues that the circuit court erred in denying his habeas petition.[4] Respondent counters that the circuit court properly denied petitioner's habeas petition. We agree with respondent. Having reviewed the circuit court's December 22, 2016, "Opinion and Order," we hereby adopt and incorporate the circuit court's well-reasoned findings and conclusions, which we find address petitioner's assignments of error. The Clerk is directed to attach a copy of the

---

[2]We take judicial notice of the mandamus proceeding, Supreme Court No. 33507.

[3]The victim's body was discovered in Ohio, but it was determined that the death occurred in West Virginia.

[4]Petitioner complains that he is unable to raise all of his issues because of the page limit for his brief. We note that we refused petitioner's motion to exceed the page limit by order entered October 4, 2018, and refused his motion for reconsideration of the October 4, 2018, order on October 25, 2018. Therefore, we decline to revisit that issue.

December 22, 2016, order to this memorandum decision. Accordingly, based on our review of the record, we conclude that the circuit court did not abuse its discretion in denying habeas relief.

For the foregoing reasons, we affirm the circuit court's December 22, 2016, order denying petitioner's petition for a writ of habeas corpus.

Affirmed.

**ISSUED**: December 20, 2019

**CONCURRED IN BY**:

Chief Justice Elizabeth D. Walker
Justice Margaret L. Workman
Justice Tim Armstead
Justice Evan H. Jenkins
Justice John A. Hutchison

17-0068

ENTERED
Law O.B. No 299
Page 882

DEC 2 2 2016

CAROLE JONES
CLERK CIRCUIT COURT

IN THE CIRCUIT COURT OF WOOD COUNTY, WEST VIRGINIA

DENNIS JOHN RYDBOM,

    Petitioner

VS:

    CASE NO: 00-P-62
    JEFFREY B. REED, JUDGE

DAVID BALLARD, WARDEN,
MOUNT OLIVE CORRECTIONAL COMPLEX,

    Respondent.

## OPINION AND ORDER

Presently pending before the Court this 21st day of December, 2016, are certain post-conviction habeas corpus petitions and amended petitions that have been filed by, or on behalf of, the Petitioner, Dennis John Rydbom.

## UNDERLYING CRIMINAL CASE:

On May 25, 1996, an unidentified woman was found wedged, upside down, in a concrete sewer pipe in Marietta, Washington County, Ohio. As a result of the investigation into this homicide, the victim was later identified as Sheree Petry, a resident of Williamstown, Wood Count, West Virginia. Although it was initially thought the victim may have died as a result of positional asphyxiation, subsequent chemical analysis revealed the cause of death to be acute chloroform intoxication.

Petitioner was subsequently indicted by a Washington County, Ohio Grand Jury for the aggravated murder of Sheree Petry. According to the indictment, the Petitioner murdered the victim "at Wood County, West Virginia or Washington County, Ohio." The Petitioner thereafter filed a motion to dismiss the indictment claiming the Washington County Common Pleas Court

1

12/22/16 Cert copy mld D. Rydbom
12/22/16 Copy dil'd Pros Atty & mld to J. Parmer

1030

lacked territorial jurisdiction over the alleged crime. After an evidentiary hearing the Washington County Common Pleas Court agreed that it lacked territorial jurisdiction and granted the Petitioner's Motion to Dismiss.

On or about July 11, 1997, a Wood County, West Virginia Grand Jury indicted the Petitioner on one count of Murder in the First Degree (Case No. 97-F-87). The Petitioner was arraigned on July 28, 1997, and pled not guilty. The Petitioner was convicted of that charge, following a jury trial that ended on February 6, 1998. On April 17, 1998, the trial court denied the Petitioner's Motion for a Judgment of Acquittal and Motion for New Trial, and sentenced Petitioner to life in prison, without mercy. The Sentencing Order was entered on May 27, 1998.

On February 10, 1998, Petitioner, by counsel, filed a Petition for Appeal to the Supreme Court of Appeals of West Virginia. On June 1, 1999, the Supreme Court of Appeals refused the Petition for Appeal (*State of West Virginia v. Dennis John Rydbom*, No. 990272).

A more thorough discussion of the facts will be set out as necessary to address specific grounds for relief.

## PREVIOUS HABEAS CORPUS FILINGS

On January 15, 1999, (while Petitioner's Petition for Appeal was pending), Petitioner filed a Petition for a Writ of Habeas Corpus in the Circuit Court of Wood County (*Rydbom v. Merritt*, Case No. 99-P-9). On March 9, 1999, the Circuit Court dismissed this habeas corpus petition as premature, in light of Petitioner's pending appeal.

On December 13, 1999, the Petitioner filed a second Petition for a Writ of Habeas Corpus in the Circuit Court of Wood County. (*Rydbom v. Kirby*, Case. No. 99-P-228). On February 23, 2000, the Circuit Court dismissed this petition as being insufficient under Rule 2(b) of the West

2

1031

Virginia Rules Governing Post-Conviction Habeas Proceedings. The Petitioner did not appeal this decision.

On May 24, 2000, the Petitioner filed a third Petition for a Writ of Habeas Corpus in the Circuit Court of Wood County (Case No. 00-P-62). This is the case currently pending before this Court[1].

On May 3, 2007, the Petitioner filed a petition for post-conviction relief with the Supreme Court of Appeals of West Virginia. On June 27, 2007, the Supreme Court of Appeals of West Virginia entered an Order construing the Petitioner's petition as a Petition for a Writ of Mandamus and directed this Court to show cause why the writ should not issue. (*State ex rel. Rydbom v. Reed*, No. 33507). On October 22, 2007, the Supreme Court of Appeals of West Virginia dismissed the mandamus action as being moot, in light of certain action and Orders entered by this Court.

## CURRENT HABEAS CORPUS PROCEEDING:

It appears that several documents have been filed by, or on behalf of, the Petitioner in this case. It is this Court's opinion that all grounds that have been raised in any of the various petitions or amended petitions should be addressed in this OPINION AND ORDER. Therefore, the following documents are being considered: 1) *Pro se* Petition for Writ of Habeas Corpus filed May 24, 2000; 2) Amended Petition for a Writ of Habeas Corpus ad Subjiciendum filed on August 29, 2009; 3) *Pro se* Amended Petition for Writ of Habeas Corpus filed on October 7, 2009; 4) *Pro se* Petitioner's Motion to Include Pages with Petition for Writ of Habeas Corpus filed on October 20, 2009; and 5) Amended Petition for Writ of Habeas Corpus filed on August 17, 2016.

---

[1] See Appendix A.

3

1032

In his *Pro se* <u>Petition for Writ of Habeas Corpus</u>, Petitioner alleges the following grounds for habeas relief:

1) Ineffective assistance of trial counsel – the Petitioner then lists some 30 specific acts he alleges constitutes ineffective assistance of counsel.

2) Denial of speedy trial pursuant to W.Va. Code § 62-3-1 and his constitutional right to a speedy trial.

3) Unlawful search and seizure – raising issues in both Ohio and Arizona.

4) Use of lingerie at trial, via coached and unreliable identifications, and references to Petitioner's sperm being on three of the articles, violated the Petitioner's right to a fair trial.

5) Newly discovered evidence: photographs of victim.

6) Failure to be provided discovery

7) The Petitioner alleges that incessant and prejudicial publicity, before and/or during trial, was so pervasive in this case that it violated the Petitioner's right to be tried by an impartial jury.

8) The trial court violated the Petitioner's due process right by denying defense counsel's request that the jurors be polled as to whether they were exposed to the highly prejudicial media publicity during trial.

9) The trial court erred in allowing the prosecutor to raise the issues of the alleged flight and of Steve Rutter in her rebuttal, over defense counsel's objection.

10) The trial court admitted improper hearsay testimony from Lynn Noel, Stephanie Foutty, Cathy Rees, Howard Rowsey in violation of the Petitioner's federal and/or state confrontation and due process rights.

11) The trial court admitted improper hearsay testimony from Lynn Noel in violation of

4

1033

the Petitioner's federal and/or state confrontation and due process rights.

Upon the filing of this *pro se* <u>Petition</u>, Ira D. Haught was appointed to represent Petitioner for the limited purpose of 1) advising Petitioner as to whether the Petitioner wants to proceed *pro se* or whether the Petitioner wants court-appointed counsel in this proceeding; 2) advise the Petitioner as to the requirements of *Losh v. McKenzie*, 166 W.Va. 762, 277 S.E.2d 606 (1981) and 3) whether the Petitioner wishes to file an amended Petition. Since that initial order appointing Mr. Haught, Petitioner has filed several motions to substitute counsel and the Court has granted those requests. Barron M. Helgoe was one of those appointed attorneys and he filed an <u>Amended Petition for a Writ of Habeas Corpus ad Subjiciendum</u> on Petitioner's behalf on August 27, 2009.

In this <u>Amended Petition</u>, Petitioner alleges the following:

1. The Petitioner received constitutionally ineffective assistance of counsel;

2. The hybrid representation of the Petitioner denied the Petitioner constitutionally meaningful assistance of counsel, or alternatively, failed to vindicate his right to self-representation;

3. The closing arguments of the prosecutor in which the prosecutor asserted personal knowledge of the guilt of the accused, vouched for the testimony of four witnesses, commented on the Petitioner's silence and failure to testify, and abandoned decorum, constituted plain error(s) cognizable under *Miller*;

4. The Petitioner was denied due process through errors on instruction on reasonable doubt and circumstantial and direct evidence;

5. The admission of multiple hearsay evidence regarding the Decedent's state of mind was not harmless and denied the Petitioner a fair trial;

5

1034

6. The Petitioner was denied a speedy trial;

7. There was insufficient evidence adduced at trial to support a guilty verdict against the Petitioner and

8. The Petitioner's Due Process Constitutional rights were violated upon the cumulative effect of all the errors committed during trial.

On or about September 1, 2009, Petitioner filed, *pro se*, his Notice to Proceed Pro Se. Since that filing, the Court has held several hearings to discuss the matter of stand by counsel with the Petitioner. The Court has appointed several attorneys as stand by counsel and has delineated the role stand by counsel is to serve. As of December 14, 2014, the Public Defender Services, Appellate Advocacy Division is the current stand by counsel.

On or about October 7, 2009, Petitioner filed his *pro se* Amended Petition for Writ of Habeas Corpus and on October 20, 2009, Petitioner filed Petitioner's Motion to Include Pages with Petition for Writ of Habeas Corpus including pages that were inadvertently omitted from his *pro se* Amended Petition.

In his *pro se* Amended Petition for Writ of Habeas Corpus, the Petitioner makes the following grounds for relief:

Part One: Speedy Trial. Violation of his right to speedy trial and due process rights

Part Two: Representation Issues – raising issues of not being able to proceed *pro se*.

Part Three. Search & Seizure: The trial court unlawfully allowed Petitioner's property to be used against him, whereas the property was seized in violation of the Petitioner's fundamental rights to be free from unreasonable searches and seizures, and to due process of law, under the Fourth and Fourteenth amendments to the United States Constitution.

Part Four: Panty Trial. The trial court and the prosecution team subjected the Petitioner to

6

1035

an unreliable, prejudicial, and misleading panty trial, whereby the Petitioner was essentially tried for possession of lingerie – unreliably (and falsely) alleged to be Sheree Petry's – in violation of the U.S. Constitution's promise of a fair trial (via charging instrument) and due process of law.

Part Five: Two-State Tag Team: Ohio and West Virginia jointly prosecuted the Petitioner so as to deprive the Petitioner of a fair trial, in violation of the Petitioner's Compulsory Process, Confrontation, Due Process, and Equal Protection rights under the U.S. Constitution's Sixth, and Fourteenth Amendments.

Part Six: Hearsay: The trial court allowed hearsay and opinion testimony to be used against the Petitioner, in violation of the Petitioner's Sixth and Fourteenth Amendment rights to: (A) confrontation; (B) compulsory process; and (C) due process of law. Specifically, he alleges that hearsay evidence was presented by the following witnesses: Howard Rowsey, Cathy Rees, Stephanie Foutty and Lynn Noel.

Part Seven: Trial by Media: The Petitioner was subjected to prejudicial presentation before and during trial which was so pervasive as to undermine the Petitioner's presumption of innocence and violate the Petitioner's due process and fair-trial right, in violation of the Constitution's 6th and 14th amendments.

Part Eight: Partisan Judge: The trial judge violated the Petitioner's 4th, 5th, 6th, & 14th Amendment rights as a result of the trial judge's errors and failure to be a neutral and detached judge.

In the Amended Petitioner for Writ of Habeas Corpus filed on August 17, 2016, the Petitioner alleges the following grounds:

Chapter One: The trial court and prosecutor violated the Petitioner's speedy trial rights under W.Va. Code § 62-3-1 and under the sixth amendment.

7

1036

Chapter Two: Representation Issues – raising issues of self-representation; assistance of counsel; and, due process of law.

Chapter Three: Search and Seizure – raising issues in Ohio and Arizona.

Chapter Four: Panty Trial – raising issues of the misleading identification of lingerie and ineffective assistance of counsel.

Chapter Five: Two-State Tag Team – alleging improper conduct between Ohio and West Virginia.

Chapter Six: Hearsay Trial. The trial judge allowed hearsay and opinion testimony (by Howard Rowsey, Cathy Rees, Stephanie Foutty, and Lynn Noel) to be used against the Petitioner in violation of the U.S. Constitution's 6th and 14th Amendment rights to confrontation, compulsory process and due process of law.

Chapter Seven: Self Incrimination

Chapter Eight: Prejudicial Publicity

Chapter Nine: Partisan Judge. The trial judge demonstrated a personal bias and favoritism for the prosecution, or antagonism against the Petitioner, making fair judgment in Petitioner's case impossible or, at best, highly dubious. In effect, Judge Reed's conduct interfered with Petitioner's defense while assisting the prosecution team, acting as a surrogate prosecutor – all in violation of the U.S. Constitution's 14th Amendment.

The Respondent filed the Respondent's Answer to Petition for Writ of Habeas Corpus on October 10, 2000, to the original Petition. The Respondent filed the Respondent's Answer to Amended Petition for Writ of Habeas Corpus on June 18, 2010, to the Amended Petition filed by Attorney Barron M. Helgoe. The Respondent filed the State's Response to Petitioner's Amended Petition for Writ of Habeas Corpus on October 11, 2011, to the pro se Petition filed by the

8

Petitioner. And finally, the Respondent filed the State's Response to Petitioner's Amended Petition for Writ of Habeas Corpus on or about October 3, 2016.

The Court held an evidentiary hearing on November 9, 2016. At this hearing the Court proceeded to ascertain whether the Petitioner was aware of *Losh v. McKenzie*, 166 W.Va. 752, 277 S.E.2d 606 (1981); his obligation to raise all grounds for relief in this proceeding; and, the consequences of a failure to raise all grounds which could have been raised.

Based upon the questioning of the Petitioner at the November 9, 2016, hearing, the Court FINDS and CONCLUDES that the Petitioner has knowingly, intelligently and voluntarily waived all grounds for relief that are not listed in his various Petitions or Amended Petitions filed in this matter.

## TWO PRELIMINARY MATTERS:

Before addressing the specific issues raised in the latest Amended Petition filed by the Petitioner, two preliminary issues need to be addressed.

First, as set forth above, the Petitioner has raised several grounds for relief in this habeas corpus proceeding. However, evidence was not presented on all of these allegations and the Petitioner does not offer arguments in support of all of these grounds for relief.

The question then becomes: What happens to all the other grounds for relief that have been alleged in the various Petitions or Amended Petitions that have been filed by, or on behalf of, the Petitioner? It is this Court's opinion that these various grounds for relief that have been mentioned, but either no facts have been presented in support of them, or no law or argument has been made in support of them, are waived.

In *State v. Lilly*, 194 W.Va. 595, 461 S.E.2d 101 (1995) the issue before the Supreme

9

1038

Court of Appeals of West Virginia was the sufficiency of information provided to a magistrate for the issuance of a search warrant. An argument apparently made by the prosecution in support of the validity of the search warrant was the "good faith" exception to the warrant requirement. However, the Supreme Court refused to consider this argument for two reasons, the second of which is relevant for the case *sub judice*:

> Second, appellate courts frequently refuse to address issues that appellants, or in this case the appellee, fail to develop in their brief. In fact, the issue of "good faith" was adverted to in a perfunctory manner unaccompanied by some effort at developed argumentation. Indeed, "[i]t is...well settled...that casual mention of an issue in a brief is cursory treatment insufficient to preserve the issue on appeal.

Footnote 16, *State v. Lilly*, 194 W.Va. 595, 461 S.E.2d 101 (1995).

In *Clain-Stefanelli v. Thompson*, 199 W.Va. 590, 486 S.E.2d 330 (1997) (overruled on other grounds, *O'Dell v. Stegail*, 226 W.Va. 590, 703 S.E.2d 561 (2010)), there was an appeal concerning the use and width of a prescriptive right of way. The appellee made certain cross-assignments of error which were not considered by the Supreme Court of Appeals of West Virginia. Justice Maynard, in writing the opinion for the Court stated:

> While the appellee asserted these cross-assignments of error in her brief, she failed to elaborate, discuss, or cite any authority to support these assertions. In *State, Dept. Of Health v. Robert Morris N.*, 195 W.Va. 759, 765, 466 S.E.2d 827, 833 (1995), we stated that "[a] skeletal 'argument', really nothing more than an assertion, does not preserve a claim . . . .Judges are not like pigs, hunting for truffles buried in briefs." (Citations omitted). We, therefore, decline to consider these cross-assignments of error.

Footnote 1, *Clain-Stefanelli v. Thompson*, 199 W.Va. 590, 486 S.E.2d 330 (1997) (overruled on other grounds, *O'Dell v. Stegail*, 226 W.Va. 590, 703 S.E.2d 561 (2010)).

Finally, in the criminal context with issues raised by a defendant, the Supreme Court of Appeals of West Virginia stated in *State v. LaRock*, 196 W.Va. 294, 470 S.E.2d 613 (1996):

> In addition to the above assignments, the defendant raises some half-

10

1039

hearted assignments that were not fully developed and argued in the appellate brief. Although we liberally construe briefs in determining issues presented for review, issues which are not raised, and those mentioned only in passing but are not supported with pertinent authority, are not considered on appeal. *State v. Lilly*, 194 W.Va. 595, 605 n. 16, 461 S.E.2d 101, 111 n. 16 (1995) ("casual mention of an issue in a brief is cursory treatment insufficient to preserve the issue on appeal "). We deem these errors abandoned because these errors were not fully briefed.

*LaRock*, 196 W.Va. 294, 470 S.E.2d 613, 621 (1996).

Based upon the above cited authority, it is clear that issues raised on appeal that are not fully developed, or mentioned only in passing, or are mentioned but not argued, or have no legal authority cited in support can be, and probably will be, treated as waived or abandoned and not ruled upon by an appellate court. The question then becomes – does this same standard apply to lower courts - specifically to circuit courts in a post-conviction habeas corpus proceeding? There is some authority that this Court believes provides some guidance on this issue.

*State of West Virginia, Department of Health and Human Resources, Child Advocate Office v. Robert Morris N.*, 195 W.Va. 759, 466 S.E.2d 827 (1995) involved a paternity action in which the Family Law Master established an amount of monthly child support and ordered payment of arrearages back to the date of the filing of the paternity action, but not back to the date of the birth of the child. An issue on appeal to the Supreme Court of Appeals of West Virginia was whether the affirmative defense of laches was pled or raised before the Family Law Master. In determining that the defense of laches was not properly pled or raised, the Court stated: "Further, '[a] skeletal 'argument", really nothing more than an assertion, does not preserve a claim...Judges are not like pigs, hunting for truffles buried in briefs."(Citations omitted). *State DHHR v. Robert Morris N.*, 195 W.Va. 759, 466 S.E.2d 827, 833 (1995). While this same language was earlier cited when discussing an appellate Court's ability to not consider issues or assertions not fully developed, it is interesting to note that in *State DHHR v. Morris N.*,

11                                                          1040

this language was used in discussing whether the affirmative defense of laches was properly pled or raised before the Family Law Master. The above cited language therefore stands for the proposition that a litigant must do more than simply make a skeletal argument to raise and preserve an issue before a Family Law Master.

This Court accordingly FINDS and CONCLUDES that all the grounds for relief that have been listed in the various Petitions and Amended Petitions filed on behalf of the Petitioner and for which no evidence was presented, or have not been mentioned or argued in his briefs, were not fully and properly raised or argued by the Petitioner and are therefore waived and will be treated as being abandoned.

As more fully discussed in the next section, this would include claims of ineffective assistance of counsel.

The second preliminary issue that needs addressed is the issue of ineffective assistance of counsel. The Petitioner, in his latest Amended Petition, does not raise ineffective assistance of counsel as an independent ground for relief. He does, however, raise this issue within almost every major topic he raises as a ground for relief in this latest Amended Petition. The Petitioner has raised ineffective assistance of counsel as an independent ground for relief in several of his prior pleadings.

The legal standard for a claim of ineffective assistance of counsel in West Virginia is set forth below:

> In the West Virginia courts, claims of ineffective assistance of counsel are to be governed by the two-prong test established in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984): (1) Counsel's performance was deficient under an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different.

Syl. Pt. 5, *State v. Miller*, 194 W.Va. 3, 459 S.E.2d 114 (1995).

12

1041

In reviewing counsel's performance, courts must apply an objective standard and determine whether, in light of all the circumstances, the identified acts or omissions were outside the broad range of professionally competent assistance while at the same time refraining from engaging in hindsight or second-guessing of trial counsel's strategic decisions. Thus, a reviewing court asks whether a reasonable lawyer would have acted, under the circumstances, as defense counsel acted in the case at issue.

Syl. Pt. 6, *State v. Miller*, 194 W.Va. 3, 459 S.E.2d 114 (1995).

The fulcrum for any ineffective assistance of counsel claim is the adequacy of counsel's investigation. Although there is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance, and judicial scrutiny of counsel's performance must be highly deferential, counsel must at a minimum conduct a reasonable investigation enabling him or her to make informed decisions about how best to represent criminal clients. Thus, the presumption is simply inappropriate if counsel's strategic decisions are made after an inadequate investigation.

Syl. Pt. 3, *State ex rel. Daniel v. Legursky*, 195 W.Va. 314, 465 S.E.2d 416 (1995).

"One who charges on appeal that his trial counsel was ineffective and that such resulted in his conviction, must prove the allegation by a preponderance of the evidence." Syl. Pt. 22, *State v. Thomas*, 157 W.Va. 640, 203 S.E.2d 445 (1974). "Failure to meet the burden of proof imposed by either part of the Strickland /Miller test is fatal to a habeas petitioner's claim." *State ex rel. Daniel v. Legursky*, 195 W.Va. 314 at 321, 465 S.E.2d 416 at 423 (1995). "Where counsel's performance, attacked as ineffective, arises from occurrences involving strategy, tactics and arguable courses of action, his conduct will be deemed effectively assistive of his client's interests, unless no reasonably qualified defense attorney would have so acted in the defense of an accused." Syl. Pt. 21, *State v. Thomas*, 157 W.Va. 640, 203 S.E.2d 445 (1974).

The above language is what is quoted and relevant in most habeas corpus proceedings. As such, ineffective assistance of counsel is an issue almost exclusively dealt with in habeas corpus proceedings. In fact, it is rarely, if ever, dealt with on the merits on direct appeal.

13

Thus, under those circumstances, we have found that issues, such as ineffective assistance of counsel, were not ripe for direct appellate review. *See, State v. Triplett*, 187 W.Va. 760, 771, 421 S.E.2d 511, 522 (1992) ("it is the extremely rare case when this Court will find ineffective assistance of counsel when such a charge is raised as an assignment of error on a direct appeal").

*State v. Miller*, 194 W.Va. 3, 14, 459 S.E.2d 114, 125 (1995).

After a thorough discussion of the reasons why ineffective assistance of counsel claims are generally not considered on direct appeal, the Court in *Miller* states: "It is apparent that we intelligently cannot determine the merits of this ineffective assistance claim without an adequate record giving trial counsel the courtesy of being able to explain his trial actions." *Miller*, W.Va. at 17, S.E.2d at 128. That is the crux of the issue. Ineffective assistance claims are very fact intensive. Questions such as: Why did the defense attorney take certain action?, or What were the factors he or she weighed in making the decision to either present certain evidence or not?, are vitally important to properly evaluate whether counsel's actions fell outside the broad range of acceptable behavior. Justice Cleckley, writing the opinion in *Miller*, goes on to state:

> In other words, we always should presume strongly that counsel's performance was reasonable and adequate. A defendant seeking to rebut this strong presumption of effectiveness bears a difficult burden because constitutionally acceptable performance is not defined narrowly and encompasses a "wide range." The test of effectiveness has little or nothing to do with what the *best* lawyers would have done. Nor is the test even what most good lawyers would have done. We only ask whether a reasonable lawyer would have acted, under the circumstances, as defense counsel acted in the case at issue.

*Miller*, W.Va. at 16, S.E.2d at 127 (emphasis in original).

Issues relating to whether trial counsel was ineffective or not generally cannot be decided on direct appeal because normally there is no discussion of trial strategy during the trial on the merits. Therefore, the record on appeal would not reflect the reasons trial counsel considered in taking whatever action is complained of as being ineffective. It is only in a habeas corpus proceeding when defense counsel (and perhaps even the Petitioner) can be called as a witness to

14

1043

answer these types of questions would there be a record as to the reasons why certain action was taken, or not taken.

In this case, however, we are in essence in the same position as we would be on direct appeal. Even though both trial counsel were called as witnesses at the habeas corpus evidentiary hearing, neither one of them testified as to why they took certain actions or what factors they considered in making certain decisions. Further, the Petitioner did not testify. Therefore, we are in the same position as in a direct appeal – no testimony as to why certain conduct was taken. The only difference is that in this case we are in a habeas corpus proceeding where the Petitioner has the burden to establish that his trial counsel was ineffective.

The many allegations of ineffective assistance of counsel as alleged in the various Petitions and Amended Petitions may be adequate to satisfy the initial review standard under Rule 4 of the Rules Governing Post-Conviction Habeas Corpus Proceedings in West Virginia. However, once past this threshold standard, allegations are insufficient to warrant relief in habeas corpus. Evidence is required in support of allegations of ineffective assistance of counsel and the Petitioner bears the burden of establishing that trial counsel was ineffective, and overcoming the presumption that trial counsel was effective in performing his or her role.

Without an adequate record, this Court has no alternative but to FIND and CONCLUDE that the Petitioner has failed to establish by a preponderance of the evidence that his trial counsel was ineffective. The Petitioner has the burden to establish that his trial counsel was ineffective. There is no testimony to support such a conclusion, especially given the strong presumption that counsel's conduct was reasonable and adequate.

The Court therefore FINDS and CONCLUDES that all Petitioner's claims for relief based upon allegations of ineffective assistance of counsel do not support relief in habeas corpus.

15

1044

# CHAPTER 1 – SPEEDY TRIAL

On May 25, 1996, the Marietta Police Department received a report that the body of an unidentified female had been found in the 300 block of Seventh Street in Marietta, Washington County, Ohio. It was ultimately determined that the body was that of Sheree Petry. The Marietta Police Department began their investigation and Sergeant Meek with the Marietta Police Department was assigned as head investigator. (*See* Transcript of October 8, 1997, Hearing at 15 and 51). About fifteen (15) officers with the Marietta Police Department and six (6) to eight (8) officers with the Washington County Sheriff's Office were involved in the investigation. (*See* Transcript of October 8, 1997, hearing at 16).

On May 27, 1996, officers with the Marietta Police Department went to the residence of Sheree Petry located at 203 East Fifth Street in Williamstown, Wood County, West Virginia. Patrolman Phyllis of the Williamstown Police Department accompanied them during this search. There was no other involvement by West Virginia authorities other than on this occasion. (*See* Transcript of October 8, 1997, hearing at 31-32). Several items were seized as result of this search.

On May 28, 1996, a search warrant was executed by members of the Marietta Police Department and the Washington County Sheriff's Department. This search occurred at the residence of Steve and Sherri Saines. The Petitioner was residing with the Saines at 620 Seventh Street, Marietta, Washington County, Ohio, at the time. Investigators were looking for property that belonged to Sheree Petry, such as her purse, driver's license, credit cards, keys to her vehicle, any clothing she would have owned, hair fibers or clothing fibers. (*See* Transcript of October 8, 1997, hearing at 19).

16

1045

On May 31, 1996, Detective Greg Nohe and Captain Roger Dutcher of the Marietta Police Department traveled to Athens, Athens County, Ohio to interview the Petitioner. Through the investigation it was determined that the Petitioner was a close friend of the deceased and one of the last persons to have seen her alive. They were accompanied by Detective Jerry Elgin and Detective John Withers with the Athens Police Department.

On June 3, 1996, Detective Shuck with the Washington County Sheriff's Department executed a search warrant at the residence of Patrick Kish in Athens, Ohio. At that time, Mr. Kish agreed to wear a body wire while Detective Schuck monitored conversations between him and the Petitioner.

Petitioner left the Marietta area and returned to Arizona in June, 1996. Officers from the Marietta Police Department and the Washington County Sheriff's Department went to Phoenix in November, 1996, to interview witnesses. Officers learned that Petitioner resided with the McGann family. Sgt. Richard Meek interviewed the McGanns regarding the Petitioner. Sgt. Meek learned that while Petitioner was staying with the McGann family, 17-year-old Kevin McGann saw several pairs of women's underwear in Petitioner's luggage sometime around September 8, 1996. Sgt. Meek learned that Vanessa McGann examined Petitioner's luggage and also found several pairs of women's underwear.

On November 12, 1996, a search warrant was executed by Detective Brian McIndoo and other officers with the Phoenix Police Department along with Sergeant Meek and Officer Nohe of the Marietta Police Department and Lieutenant Seevers of the Washington County Sheriff's Department at the Petitioner's residence, located at 911 East Medlock Road, Phoenix, Maricopa County, Arizona. (*See* Transcript of October 9, 1997, hearing at 94) Detective McIndoo was asked to assist the Ohio authorities in the execution of the search warrant. (*See* Transcript of

17

1046

October 9, 1997, hearing at 92) As a result of that search warrant, several items were seized and these items were released to Sergeant Meek of the Marietta Police Department to be brought back to Ohio as evidence. (*See* Transcript of October 9, 1997, hearing at 101)

The record does not disclose when the Petitioner was arrested in Arizona, but he did waive extradition on November 20, 1996, and agreed to be returned to the State of Ohio from the State of Arizona. The record is not clear as to when the Petitioner was indicted in Ohio or what type of pre-trial proceedings occurred in Ohio, but on January 27, 1997, the Washington County Common Pleas Court ordered the dismissal of the indictment against Petitioner in Ohio because the Court found that it lacked territorial jurisdiction to adjudicate the charge because the Petitioner had established that it could reasonably be determined that the victim's death occurred in West Virginia.

On January 27, 1997, Sgt. B.D. Adkins of the West Virginia State Police initiated criminal proceedings against Petitioner in West Virginia by filing a Criminal Complaint in the Magistrate Court of Wood County, West Virginia. A warrant for the arrest of the Petitioner was issued on January 27, 1997. The Petitioner made his initial appearance in Wood County Magistrate Court on January 30, 1997. A preliminary hearing was held on February 7, 1997, and probable cause was found and the case was bound over to Circuit Court.

Several matters were heard in Circuit Court prior to the Petitioner being indicted. On January 31, 1997, a bond hearing was held and the Petitioner made an oral motion for a speedy trial. On February 20; March 19; and, April 28, 1997, motions were heard regarding the employment and payment of investigators for the defense. Further, on June 11, 1997, a Motion to Dismiss was heard. The basis for this Motion was due to the Petitioner being held in jail and not being indicted quickly enough. This Motion was denied with the Court reasoning that the

18

State had until the end of the May 1997, term of court to indict the Petitioner.

The Petitioner was ultimately indicted in July (in the middle of the May 1997 term) and was arraigned on July 28, 1997, by Senior Status Judge Arthur N. Gustke. A trial date was not set at the arraignment because the defense had filed a Motion for a Change of Venue. A hearing on this Motion was set for August 4, 1997. There was a discussion, at this arraignment, of setting trial for November 3, 1997. The Petitioner objected to this trial date.

A hearing on the Motion for Change of Venue was held on August 4, 1997, presided over by Senior Status Judge Arthur N. Gustke. The Motion was denied with the Court finding that the defense did not make the requisite showing to justify a change in venue. Trial was set for November 3, 1997.

After the Change of Venue issue was decided, the following pre-trial hearings were held:

- A pre-trial hearing was held on September 11, 1997. Evidence was presented on a Motion to Suppress Defendant's statement given to Detective Nohe and Captain Dutcher (Marietta Police Department) and the State was to arrange for the defendant and counsel to see the lingerie that was still awaiting testing at the West Virginia State Police lab.
- The defendant appeared on arraignment day in September, on September 19, 1997. Since trial had already been set there was no new trial date set but the defendant did renew his motion to dismiss for failure to provide him a speedy trial.
- A pre-trial hearing was held on October 3, 1997. The Court ruled that Defendant did not establish there was a need for a Franks hearing on the truthfulness of the Ohio search warrant affidavits; the Court ruled on the Defendant's Motion Detailing General and Specific Requests for Favorable Evidence and Impeachment Evidence; the Court ruled on the Defendant's Motion for Disclosure of Writings Used to Refresh Recollection; the Court ruled on Defendant's Motion for Notice of Intent to Use Suppressible Evidence; the Court ruled on Defendant's Motion for Grand Jury Testimony; the Court ruled on Defendant's Motion for Bill of Particulars; the Court ruled on a Motion to Suppress Statements Allegedly Made by Mark Loiseau and Defendant's Supplemental Motion for Favorable Evidence and Impeachment Evidence; the Court ruled on the State's Motion for Palm Prints; and, the Court ruled on Defendant's Motion for Jury View.
- A pre-trial hearing was held on October 8, 1997. Testimony was presented regarding the admissibility of the search warrant conducted on May 28, 1996 at the Saines/Petitioner's residence, and testimony was presented on the admissibility of the searches conducted on

19

1048

June 3, and November 12, 1996. Testimony was also presented on the admissibility of certain statements made by the Petitioner.

- A pre-trial hearing was held on October 10, 1997. At this hearing the process for the selection of the jury was discussed. In addition, the State's Motion to Continue was discussed. For reasons that appear upon the record, the Court granted the Motion to Continue, but continued the trial to a date within the same term of Court – January 6, 1998.

- A pre-trial hearing was held on November 5, 1997. At this hearing the Court heard argument on the Defendant's Motion to Represent Himself; granted a defense Motion to Approve Expenses; and, heard further testimony on the Ohio and Arizona search warrants and the trash issue from the May 28, 1996, search.

- A pre-trial hearing was held on November 6, 1997. At this hearing the Court addressed the Defendant's Motion to Secure Attendance of Non-Resident Witnesses; heard further evidence on the Ohio and Arizona search warrants; heard further evidence on the trash issue regarding the May 28, 1996, search; the Court ruled that there was no need for a suppression hearing regarding the identification of lingerie; heard evidence regarding the Defendant's statement(s) during the execution of the Arizona search warrant; addressed the Defendant's Motion in Limine filed October 6, 1997; and, addressed the Defendant's Motion to Suppress and Motion in Limine filed on September 24, 1997.

- A pre-trial hearing was held on November 7, 1997. At that hearing additional evidence was presented on the Ohio search warrants; additional evidence was presented on the admissibility of the defendant's statement during the Arizona search; and, testimony was heard concerning the body wire worn by Patrick Kish.

- On November 26, 1997, the Court ruled on the admissibility of the Athens County, Ohio search.

- A pre-trial hearing was held on December 2, 1997. At that hearing the Court addressed the Defendant's Motion to Suppress and Motions in Limine filed on September 25, 1997; the Defendant's Motion in Limine regarding the issue of flight; and for a pretrial or in camera hearing on issue of flight; the Defendant's Motion to Compel Garments (lingerie); the Defendant's Motion to Compel the Release of the Victim's Business Records; the Defendant's Motion in Limine concerning The Handbook of Poisoning, the issue of Ordering the Washington County, Ohio prosecuting attorney to release the Washington County, Ohio grand jury transcripts; the Court heard the audio portions of the body wire of June 3, 1996; heard testimony on the flight issue; and, addressed Defendant's Motion to Dismiss on the basis of denial of speedy trial.

- A pre-trial hearing was held on December 3, 1997. At this hearing the Court heard testimony on the issue of flight; heard testimony on the defendant's statement to Scott Zeoli; and, the issue of profiling was discussed.

- A pre-trial proceeding was held on December 23, 1997. At this hearing, the Court addressed the Defendant's Motion to Suppress the West Virginia State Police CIB report; the Motion to Dismiss based on speedy trial; the Defendant Motion for reconsideration of identification

1049

of lingerie; the Amended Motion for the Ohio Grand Jury Transcript; the Defendant's Motion that the State not be permitted to use Defendant's aliases; the Court addressed that McIndoo's telephone deposition had not been completed for the Arizona statement issue; and, there was a discussion of the jury voir dire process.

The defense filed approximately 44 pre-trial motions. Some of the motions were perfunctory, but others dealt with issues of vital importance, such as the statements of the defendant that occurred in Arizona and Ohio, searches of the defendant's home that occurred in Arizona and Ohio, and many evidentiary issues. Below is a list of the motions filed by the defense prior to the trial of this matter, along with an approximate date of the filing of that motion:

- Motion to Retain Investigative Services (2/6/1997)
- Motion to Approve Expenses (3/13/1997)
- Motion for Speedy Trial in this Term or Dismissal of Complaint (5/22/1997)
- Defendant's Supplemental Brief in Support of Motion for Speedy Trial (6/12/1997)
- Motion to Approve Expenses (7/23/1997)
- Defendant's Demand for Speedy Trial (7/24/1997)
- Defendant's Motion for Change of Venue 7/29/97)
- Defendant's Motion to View Evidence (8/5/1997)
- Defendant's Motion for Access to Law Library (8/5/1997)
- Defendant's Request for Further Discovery (8/5/1997)
- Defendant's Motion to Suppress (8/26/1997)
- Defendant's Request for Further Discovery (8/26/1997)
- Defendant's Motion Detailing General and Specific Requests for Favorable Evidence and Impeachment Evidence (9/3/97)
- Defendant's Motion for Rule 403 R.O.E Hearing (9/3/1997)
- Defendant's Motion for Notice of Intent to Use and Description of 404(b) Evidence (9/3/1997)
- Defendant's Motion to Produce Grand Jury Minutes (9/3/97)
- Defendant's Motion for Notice of Intent to Use Suppressible Evidence (9/3/1997)
- Motion for Disclosure of Writing Used to Refresh Memory, Evidence to be Offered Pursuant to Rules 613, 804(24), and 804 (5), W.V. Evid., Other Writings and Recorded Statements, and Matters as to Which the State Will Seek Judicial Notice (9/3/1997)
- Defendant's Motion in Limine (9/8/97)
- Defendant's Motion for Bill of Particulars (9/8/97)
- Defendant's Motion to Suppress (9/10/97)

21

1050

- Defendant's Supplemental to Motion to Suppress (9/15/97) Motion to Suppress Statements Allegedly Made to Mark Kenneth Loiseau (9/15/97)
- Defendant's Supplemental Motion to Suppress Arizona Search & Seizure (9/24/97)
- Defendant's Motion to Dismiss Indictment (9/25/97)
- Defendant's Motion to Suppress and Motion in Limine (9/25/97)
- Defendant's Second Supplemental Motion to Suppress Arizona Search & Seizure (9/26/97)
- Defendant's Motion to Suppress and Motion in Limine (10/2/97)
- Defendant's Motion for Jury View (10/2/97)
- Defendant's Third Supplemental Motion to Suppress Arizona Search & Seizure (10/3/97)
- Defendant's Motion in Limine (10/6/1997)
- Defendant's Motion in Limine (10/8/97)
- Defendants Motion to Compel Discovery (10/10/97)
- Defendant's Motion Limine (10/10/97)
- Defendant's Motion to Compel Discovery (10/28/97)
- Defendant's Motion in Limine and Motion for *In Camera* Hearing (10/28/97)
- Motion to Approve Expenses (10/31/97)
- Defendant's Motion to Represent Himself (11/4/97)
- Defendant's Motion to Compel Release of Garment Evidence for Independent DNA Analysis by Defendant, and for Disclosure of Chain of Custody of Garment Evidence or, in the Alternative, for Sanctions Against the State (11/13/97)
- Defendant's Amended Motion Re Ohio Grand Jury Transcript (12/22/97)
- Defendant's Motion to Suppress WVSP-CIB Lab Report (12/23/97)
- Defendant's Motion to Dismiss for Denial of Right to Speedy Trial (12/23/97)
- Defendant's Motion in Limine to Prohibit the State From Introducing Evidence or Referring to the Existence of Semen in Women's Garments (12/30/97)
- Defendant's Motion to Preclude Cross-Examination of Defendant on Matters Outside the Scope of Direct Examination (12/30/97)
- Motion to Approve Expenses (1/5/98)

There is no doubt that the Petitioner often asserted his right to a speedy trial. The relevant question is: On what date did the Petitioner assert that right so that it imposed an obligation on the State of West Virginia to provide him a jury trial without unreasonable delay?

The Petitioner alleges in his various Petitions/Amended Petitions that he was arrested in Arizona in November of 1996. He further alleges that he was then transported to various states, ultimately coming to rest in Ohio. While it is unclear if the record establishes exactly what date the Petitioner was arrested in Arizona, or exactly how many states he traveled through to

22

ultimately arrive in Ohio, or exactly how many days the Petitioner was incarcerated in Ohio or other states prior to being placed in jail in West Virginia, this Court believes that under the facts and circumstances of this case, this information is not of prime relevance to the ultimate speedy trial issue.

This information is not relevant in this case because the State of West Virginia cannot be held responsible for what occurred outside of its jurisdiction and control. There is no allegation, or evidence, that any law enforcement or prosecutorial authority from West Virginia was involved in the investigation or prosecution of this crime until this case was, in essence, dropped in their laps on January 27, 1997, when the Washington County Common Pleas Court dismissed the Ohio indictment against the Petitioner. The only involvement of any West Virginia authorities prior to that date was when the Williamstown Police accompanied law enforcement from Ohio to look at the victim's residence on May 27, 1996. Other than this incident, there is no evidence of record that any law enforcement or prosecutorial authority in West Virginia had any involvement, or control, of the case prior to January 27, 1997.

A warrant for the arrest of the Petitioner was issued out of the Magistrate Court of Wood County on January 27, 1997. At the Petitioner's initial arraignment in Magistrate Court, he asserted his right to a speedy trial. This assertion had no legal effect, other than to perhaps assert his right to a speedy preliminary hearing. The preliminary hearing occurred on February 7, 1997, and there is no allegation that this was untimely in any manner.

The Petitioner's assertion of his right to a speedy trial at his initial appearance in Magistrate Court could also perhaps be construed as an assertion of his right to have his case presented to a grand jury within 2 terms, pursuant to W. Va. Code 62-2-12. If this were true, this assertion of his right pursuant to this Code section was also complied with. The terms of court in Wood

23

1052

County in 1997 were January, May and September, specifically beginning on the second Monday of these months. The Petitioner was arrested on January 27, 1997, which was during the January 1997 term of court. By asserting his right under W.Va. Code 62-2-12, the Petitioner needed to have his case presented before a grand jury, at the earliest, before the end of the May 1997 term. The end of the May 1997 term was in early September 1997. The Petitioner was indicted in the middle of July 1997, which is within 2 terms of court of being arrested and incarcerated in West Virginia.

At his initial appearance in Circuit Court, upon being indicted, the Petitioner asserted his speedy trial right. This triggered his rights under W.Va. Code 62-3-1. The boundaries of the Petitioner's speedy trial right has been discussed by the Supreme Court of Appeals of West Virginia in several cases.

> The determination of what is good cause, pursuant to W.V. Code, 62-3-1, for a continuance of a trial beyond the term of indictment is in the sound discretion of the trial court, and when good cause is determined a trial court may, pursuant to W.Va. Code, 62-3-1, grant a continuance of a trial beyond the term of indictment at the request of either the prosecutor or defense, or upon the court's own motion.

Syl. Pt. 2, *State ex rel. Shorter v. Hey*, 170 W.Va. 249, 294 S.E.2d 51 (1981)

> The possible reasons justifying good cause for a continuance under W.Va.Code, 62-3-1, are broader than the causes listed in W.Va. Code, 62-3-21, as valid reasons for not counting a particular term. As a consequence, the causes justifying continuances listed in the three-term rule, W.Va.Code, 62-3-21, may be applied in a one-term rule situation, but the general good cause standard in W.Va.Code, 62-3-1, may not be applied in a W.Va.Code, 62-3-21 situation.

Syl. Pt. 4, *Good v. Handlan*, 176 W.Va. 145, 342 S.E.2d 111 (1986)

> Under W.Va. Code, 62-3-1, which provides a personal right to criminal defendants to be tried more expeditiously than the Constitution requires, the burden is on the party seeking this statutory protection to show that the trial was continued without good cause.

Syl. Pt. 3, *State v. Lambert*, 175 W.Va. 141, 331 S.E.2d 873 (1985)(quoting Syl. Pt. 2,

24

1053

*Pitsenbarger v. Nuzum,* 172 W.Va. 27, 303 S.E.2d 255 (1983)).

> A trial judge in a multi-judge circuit may, upon his own motion and for good cause, order a continuance of a trial beyond the term of indictment because of the judge's congested trial docket, and such judge need not ascertain whether any other judge in the circuit can try the case within the term of indictment.

Syl. Pt. 3, *State ex rel. Shorter v. Hey,* 170 W.Va. 249, 294 S.E.2d 51 (1981)

> There a number of practical problems facing a trial court in attempting to try a defendant in the term of his indictment. Numerous indictments for example, may be returned in the middle of the term, making trial upon such indictments in that term difficult if not impossible....Moreover, in a criminal case, pretrial procedures and the nature and evidence relating to the offense to be tried may contribute to the difficulty in trying a defendant in the term of his indictment....Often, the court must consider and rule upon various pre-trial motions filed by defense counsel. Such pre-trial motions include discovery type motions and motions in arrest of prosecution. In a case involving a confession, whether a motion to suppress be filed or not, the trial court must hear evidence and determine the initial voluntariness of the confession out of the presence of the jury....These factors, and others, often times contribute to the difficulties in trying criminal cases in the term of indictment.

*State ex rel. Shorter v. Hey,* 170 W.Va. 249, 255-256, 294 S.E.2d 51, 58 (1981)

> The provisions of W.Va.Code, 1931, 62-3-1, as amended, which mandate that an accused shall be tried at the same term in which the indictment was returned 'unless good cause is shown for continuance', are not violated when the record reveals that the time consumed for the proper treatment of the defendant's motions and pleadings in furtherance of his defense constituted 'good cause' for continuance.

Syl. Pt. 6, *State v. Grimmer,* 162 W.Va. 588, 251 S.E.2d 780 (1979) (overruled on other grounds by *State v. Petry,* 166 W.Va. 153, 273 S.E.2d 346 (1980))

> While illness of the judge, the unavoidable absence of witnesses, or other difficulties beyond the court or litigants' control may, indeed, constitute good cause for a continuance, a refusal as a matter of common practice to conduct jury trials during the June term of court is not good cause, since among other reasons, it is not unavoidable.

*State ex rel. Workman v. Fury,* 168 W.Va. 218, 222, 283 S.E.2d 851, 853 (1981)

"Although difficulties beyond the control of the court or litigants, along with the reasons listed in

W.Va.Code, 62-3-21, can constitute good cause, the circuit court should not grant continuances

25

1054

for the prosecution's convenience." *Lewis v. Henry*, 184 W.Va. 323, 327, 400 S.E.2d 567, 571 (1990). In *Lewis*, the Supreme Court of Appeals held that the Defendant Lewis had failed to establish that the trial judge had abused his discretion in continuing the trial because forensic testing would not be completed by the trial date.

From a review of these cases, the following reasons can be filtered out to justify not trying a case in the term of indictment: congested trial docket; an indictment returned in the middle of a term; pretrial proceedings; dealing with issues of a search; dealing with issues of a statement; illness of a judge; and, forensic testing.

All of these issues, some to a greater degree than others, were involved in this case. First, this case was presented to a Grand Jury during the middle of the May 1997 term. So this indictment was returned in the middle of a term.

Second, as set out above, approximately 44 pre-trial motions were filed by the defense. At a pre-trial hearing on October 10, 1997, the Petitioner was prepared to waive all his pre-trial motions so that he could pursue his speedy trial right. However, by October 10, 1997, the case had already been set into the next term of court – the Petitioner was indicted in the May 1997 term and the pre-trial hearing on October 10, 1997, was in the September 1997 term. Regardless, the Petitioner had his trial in the September 1997 term of court – the trial began on January 6, 1998, which is still in the September 1997 term of court. Another problem with the Petitioner attempting to waive all his pre-trial motions on October 10, 1997, was that some of the issues that needed to be addressed dealt with searches and statements – issues that needed to be addressed prior to the trial. Further complicating these search and statement issues was that the searches and statements occurred in foreign jurisdictions – Arizona and Ohio.

Third, in mid-June 1997, the Supreme Court of Appeals of West Virginia began entering

1055

Orders assigning Senior Status Judge Arthur N. Gustke to preside over cases on this Court's docket due to the illness of the presiding judge. See Appendix B. Senior Status Judge Gustke was assigned to cover cases until September 30, 1997. See Appendix C. As a result, Senior Status Judge Gustke presided over the Petitioner's initial appearance in Circuit Court and the hearing on the Motion for Change of Venue. At either the initial appearance or the hearing on the Change of Venue Motion, counsel inquired as to whether Judge Gustke wished to preside over this case. Judge Gustke replied No!. (See, transcript of August 4, 1997, hearing) So, there was also illness of the presiding judge to whom this case was assigned.

Finally, there was scientific evidence involved in this case. Several pre-trial motions related to this scientific evidence and obtaining the material back from the State Police lab so that the defense could also perform their own scientific tests.

This Court FINDS and CONCLUDES that the Petitioner's speedy trial rights were not violated and therefore the Petitioner is not entitled to relief in habeas corpus on this ground.

## CHAPTER 2 – REPRESENTATION ISSUES

On November 5, 1997, a pre-trial hearing was held in this matter. One of the issues discussed at that hearing was the Petitioner's Motion to Represent Himself. This was a Motion the Petitioner filed, *pro se*, on November 4, 1997. At the beginning of the discussion on this Motion, the Petitioner stated that he wanted to represent himself. After some discussion concerning some of the disadvantages to representing himself, the Petitioner agreed that there were disadvantages and admitted that he needed help. This is also when the Petitioner stated that his main concern was to control what was most important in the case.

At this point in the hearing the discussion turned to how much control over a case a client

1056

had in the traditional attorney-client relationship. Again, during this discussion, the Petitioner agreed he needed help with the building and presentation of his defense and indicated that he wanted over-riding authority on what gets pursued. During this discussion, the Petitioner went from wanting to represent himself, to having his current counsel act as stand by counsel, to having his current counsel act as co-counsel. But again, all through this discussion, the Petitioner stated that he wanted strategic control of the defense.

The Petitioner stated, not less than 5 times, that if he had strategic control over the case, that he did not want to proceed *pro se*. In addition to the statements about having strategic control, the Petitioner admitted at least 4 times that he knew he needed help with the case.

The reason this ebb and flow of the Petitioner's thoughts on this topic are highlighted is to show that the Petitioner did not unequivocally waive his right to counsel.

What the Court attempted to do as a resolution, was to fashion a remedy that gave the Petitioner the relief he seemed to want most (strategic control of the case) while allowing his attorneys to actively represent him. The Petitioner was in agreement with this arrangement and did not raise the issue of representing himself again, even though he was given the ability to, even without the consent of his attorneys.

During this hearing, the Court was of the opinion that a criminal defendant had the authority to maintain strategic control over the case in a traditional attorney-client relationship. There was some disagreement between the attorneys as to whether this was in fact correct under the controlling case law. But, whether the Court was correct or not on this issue is of no moment. If the Court was correct and the Petitioner already had this authority, then the Court's decision merely affirmed on the record the role of the various players for the defense. If the Court was incorrect and the Petitioner did not have the strategic control of the case before this

28

1057

hearing, then the Court gave the Petitioner what he wanted most – strategic control over the defense. Further, if the Court was incorrect and the Petitioner did not have strategic control over the case before this hearing, then this decision would have fallen into one of the hybrid situations that defense counsel was arguing the Court had the authority to implement under the controlling case law.

Another aspect of the ruling on November 5, 1997, that the Petitioner does not discuss is the fact that the ruling left open for further discussion the various roles of the defense team. In other words, the Court specifically ruled that if, as the defense develops its case and as the case proceeded toward trial, the Petitioner wanted to have more involvement in the case, such as being involved in *voir dire*, or giving the opening statement or closing argument or questioning a particular witness, that the Petitioner could bring this issue back before the Court. If the Petitioner brought this issue back before the Court, then the Court would have to decide whether to allow the Petitioner to be involved to the extent that the Petitioner desired. The Court also specifically advised the Petitioner that he could file such a request on his own, without going through defense counsel. (*See*, pages 30-38 of the November 5, 1997, hearing transcript).

Neither defense counsel nor the Petitioner ever asked to change the roles of the defense team. In other words, even though the Court left open for further discussion whether the roles of the defense team could change, there was never a request by either the Petitioner's counsel or the Petitioner to make such a change. The Petitioner cannot complain about the relationship between himself and his counsel when he agreed to the relationship, had the ability to change the relationship, and yet he failed to bring the issue back before the Court.

To be effective, a criminal defendant must timely and unequivocally waive his right to counsel. *State v. Sheppard*, 172 W.Va. 656, 310 S.E.2d 173 (1983). The request in this case was

29

1058

timely. However, this Court found at the time of the hearing, and again finds in this habeas corpus proceeding, that the waiver was not unequivocal. One of the reasons the Court in *Sheppard* found the request to proceed *pro se* was equivocal was because it appeared that the request was made as a result of the trial court's denial of Sheppard's request for the appointment of other counsel. Similarly, in this case, it is abundantly clear, from both the written Motion and the statements by the Petitioner at the hearing, that the Petitioner was upset with his counsel for not pursuing his speedy trial rights effectively enough, at least in his mind.

The Petitioner next goes on for some 3 ½ pages under the heading "Disloyal Attorneys". These allegations appear to fall under the heading of ineffective assistance of counsel. As discussed earlier, the Petitioner's claims of ineffective assistance of counsel under this heading must fail because the Petitioner did not introduce any evidence on these topics during the evidentiary hearing on November 9, 2016. Without such a record, it is impossible to FIND that counsel was ineffective.

For the reasons set forth above, the Court FINDS and CONCLUDES that the Petitioner has not established any basis for relief in habeas corpus on this claim.

## CHAPTER 3 – SEARCH AND SEIZURE

The Petitioner raises several issues under this heading. The first issue calls into question the lawfulness of a search at 911 East Medlock Drive in Phoenix, Arizona. This search occurred on or about November 12, 1996. The Petitioner states the affidavit used to secure the search warrant provided no nexus between the Petitioner and the location to be searched – 911 East Medlock Drive in Pheniz, Arizona.

The Supreme Court of Arizona answered this very question in *State v. Ault*, 150 Ariz. 459,

30

1059

724 P.2d 545 (1986). In *Ault*, law enforcement obtained a search warrant for the defendant's residence. The defendant challenged the sufficiency of the affidavit because "it did not characterize the place to be searched as his residence and it did not sufficiently state why the affiant believed that the clothes worn by defendant previously would be at the residence." *Ault*, Ariz at 466, P.2d at 552.

The Supreme Court of Arizona stated: "The description in a search warrant must be of sufficient particularity to enable a searching officer to ascertain the place to be searched, and property to be seized." *Ault*, Ariz at 466, P.2d at 552. (internal citations omitted). The opinion goes on to restate the standard in Arizona:

> Search warrants are presumed to be correct and should not be invalidated by a hypertechnical interpretation when a magistrate had probable cause to issue the warrant. Doubtful or marginal affidavits should be considered in light of the preference of validity accorded search warrants. Affidavits in support of search warrants should be interpreted in a commonsensical and realistic fashion.

*Ault*, Ariz at 466-67, P.2d at 552-53. (internal citations omitted).

The *Ault* Court then stated that the affidavit in support of the search warrant provided the following 3 items: it defined the place (address of the home) to be searched; it defined the items to be seized; and, a connection to the defendant. All three of these items are contained in the affidavit in the case *sub judice*. The affidavit contained the address of the place to be searched (911 East Medlock Drive); it listed the items to be seized (1. Purse and contents, including drivers license, credit cards, wallet, checks and keys to Sheree Ann Petry. 2. Day planner or calendar 5 X 8 inches, burgundy in color belonging to Sheree Ann Petry. 3. Multi-colored daypack belonging to Sheree Ann Petry. 4. Several pairs of women's underwear, size 6 to 7. 5. Bikini bathing suit. 6. Womens night gown. 7. Compact disk titled, "the Yearning" or "The Dreamer". 8. Documents showing occupant(s) residing at 911 East Medlock Drive. 9. Photographs.); and, by reading the affidavit there was a connection between the Petitioner and

31

1060

the victim, Sheree Ann Petry.

The Supreme Court of Arizona concluded its discussion about this topic with the following reasoning: "We believe the magistrate had probable cause to issue the search warrant and that he could rationally determine from the affidavit that the place to be searched was the defendant's residence in which the described clothing would be found." *Ault*, Ariz at 467, P.2d at 553. This same reasoning applies to the Rydbom search warrant. The judge who issued the search warrant could rationally determine from the affidavit that the placed to be searched was the defendant's residence. Rydbom is named throughout the affidavit, as is Sheree Ann Petry. The affidavit links them together. From this, the Court does not believe that the affidavit is deficient under Arizona law.

The Petitioner next raises the issue of whether it is proper for Arizona authorities to give the fruits of the search in Arizona to the Ohio authorities, and then for the Ohio authorities to give those same items to the West Virginia authorities. For reasons discussed more fully, *infra*, under the heading "Two-State Tag Team", this Court does not believe that there is any infirmity that would give rise to relief in habeas corpus with the Arizona authorities handing over the items seized in Arizona to the Ohio authorities, nor any problem with the Ohio authorities handing over the items in their possession to the West Virginia authorities.

The Petitioner next raises the issue of ineffective assistance of counsel. First, it is alleged that his trial counsel failed to raise the issue of the Arizona affidavit not providing a link between the placed searched and the Petitioner. This issue was fully discussed in the first section of this heading and this Court has concluded that the affidavit was sufficient under Arizona law at the time.

The Petitioner next alleges his trial counsel was ineffective for not challenging the

32

1061

Arizona officials giving the fruits of the search to the Ohio authorities and then the Ohio authorities passing those items on to the West Virginia authorities. As discussed, *infra*, under the heading "Two State Tag Team", this Court believes that this process was appropriate and proper.

The last issue raised by the Petitioner under this heading is a claim that a Leon Saja had the Petitioner followed and perhaps even broke into the Petitioner's home in Arizona. No evidence was presented on this issue at the evidentiary hearing in this habeas corpus proceeding. Further, the allegations under this heading are pure conjecture and speculation. Therefore, it does not form the basis for any relief in habeas corpus.

Based upon the above analysis, this Court would FIND and CONCLUDE that the Petitioner is not entitled to any relief in habeas corpus under the heading "Search and Seizure".

## CHAPTER 4 – PANTY TRIAL

In this section, the Petitioner complains about certain pieces of evidence that were admitted into evidence at the trial of this matter. These pieces of evidence can generally be categorized as women's lingerie (panties, bras, etc.). It was alleged and argued by the State that at least some of these articles of women's lingerie belonged to Sheree Petry. It was the Petitioner's position that none of these articles of women's lingerie belonged to Sheree Petry.

First, this Court FINDS that the whole issue of the admissibility of the women's lingerie is not subject to review in a habeas proceeding. In *State ex rel. Farmer v. McBride*, 224 W.Va. 469, 686 S.E.2d 609 (2009), the West Virginia Supreme Court of Appeals noted the following:

> In addition, this Court has explained that '[h]abeas corpus serves as a collateral attack upon a conviction under the claim that the conviction was obtained in violation of the state or federal constitution.' *Edwards v. Leverette*, 163 W.Va. 571, 576, 258 s.E.2d 436, 439 (1979). Therefore, '[w]hile our legislature through the enactment of *W. Va. Code*, 1931, 53-4A-1 through 11, as amended has provided a broad and effective post-conviction review, we still maintain a distinction, so far

1062

as post-conviction remedy is concerned, between plain error in a trial and error of constitutional dimensions. Only the later can be proper subject of a habeas corpus proceedings." *Id.* According, Syllabus Point 4 of *Sate ex rel. McMannis v. Mohn*, 163 W.Va. 129, 254 S.E.2d 805 (1979), holds that '[a] habeas corpus proceeding is not a substitute for a writ of error in that ordinary trial error not involving constitutional violations will not be reviewed.' *See also Pethel v. McBride*, 219 W.Va. 578, 588, 638 S.E.2d 727, 737 (2006) ("The right to habeas relief is, by necessity, limited. If it were not, criminal conviction would never be final and would be subject to endless review.").

*State ex rel. Farmer v. McBride*, 224 W.Va. 469, 479-480, 686 S.E.2d 609, 619-620 (2009).

Second, in the Petitioner's argument about the "panty trial", he reviews the evidence and all the inconsistencies with regard to the evidence concerning the ownership of the women's lingerie. The issue of whether the Petitioner possessed any of the victim's lingerie was fully and fairly litigated before the jury and the jury chose to convict the Petitioner of the murder of Sheree Petry. Credibility issues are for the jury, not the Court in a habeas corpus proceeding.

The Petitioner ends this chapter of his Amended Petition with allegations that his trial counsel was ineffective for various reasons. This Court has already discussed and decided the issue of ineffective assistance of counsel, see *infra*, but will take a few of his arguments on this topic to highlight why the Court, with the bare record before it, cannot find that the Petitioner has sustained his burden of proof on the issue of ineffective assistance of counsel.

The Petitioner alleges that his trial counsel was ineffective for allowing all the women's lingerie into evidence once one piece was admitted. It must be emphasized that there is no evidence before this Court as to why this decision was made, or what type of discussions were had about this decision. Since the Petitioner has the burden to establish

34

that his counsel was ineffective, the Petitioner has failed to meet this burden of proof requirement.

Whether some of the women's lingerie-that the Petitioner possessed were actually the victim's, was a credibility determination given the testimony at trial. Based upon the testimony of Howard and Sharon Rowsey, it would have been inappropriate to keep the items that they identified as being Sheree Petry's lingerie that were in the possession of the Petitioner from being admitted into evidence. As a result, it was very unlikely that all the lingerie would be excluded. Therefore, it is quite reasonable to want all the lingerie to be admitted. While it may paint the Petitioner as being odd, better to be considered odd than to be convicted of murder. Also, there are some very good arguments that at least some of the women's lingerie that the Petitioner possessed did not belong to Sheree Petry.

If only the women's lingerie that were identified as being the victim's were admitted, the jury might conclude that the Petitioner only possessed the victim's lingerie. However, if some of the women's lingerie were likely to not be owned by Sheree Petry (such as the underwear that was sized too big or the items that were purchased after the death of Sheree Petry), then it lessens the argument that any of the items were owned by Sheree Petry.

Therefore, there is a reasonable explanation for counsel's position that if one piece of the women's lingerie was admitted into evidence, then counsel wanted all the lingerie to be admitted. This is the very reason why a claim of ineffective assistance of counsel cannot be sustained on an empty record.

The Petitioner also complains that trial counsel failed to have all the lingerie

35

1064

subject to genetic testing and also failed to impeach Sharon Rowsey with at least two of her prior inconsistent statements. Again, as pointed out before, there has been no evidence presented on these issues and why certain decisions were made. However, the Petitioner was adamant about having a speedy trial. So, the issue is, how do you balance the Petitioner's desire to have a speedy trial with the desire to have genetic testing done on the women's lingerie? How many pieces of women's lingerie needed to be tested? How much time would it take for this genetic testing? Would this necessitate further delay in the trial?

As for the impeachment of a witness with at least two prior inconsistent statements, there again is no evidence as to how much information was provided to defense counsel by the State during discovery, but did defense counsel have the time to digest all the material provided in discovery, as well as deal with all the search issues (from foreign jurisdictions), as well as deal with all the other pretrial issues while honoring the Petitioner's over-riding desire for a speedy trial? During a pretrial hearing defense counsel indicated that there were approximately 200 witnesses to deal with, in addition to the forensic evidence. Again, how do you balance the Petitioner's overriding desire for a speedy trial with the need to review and digest all the material in this case?

Based upon the above, the Court would FIND and CONCLUDE that the Petitioner has failed to establish any relief in habeas corpus under this heading.


**CHAPTER 5 – TWO STATE TAG TEAM**

In this Chapter, the Petitioner makes various complaints about the West Virginia prosecution in this case. As discussed in the section dealing with the speedy trial issue, the

1065

prosecution of the Petitioner began in Ohio. This is not unreasonable since the body of Sheree Petry was found in Marietta, Ohio. The investigation travelled to Arizona (mainly because the Petitioner fled to Arizona after the murder of Sheree Petry), but the investigation was always centered in Ohio. After the Petitioner was indicted in Ohio, the Petitioner filed a motion before the Washington County, Ohio, Court of Common Pleas challenging the jurisdiction of Ohio to prosecute him.

The record in this case does not contain a copy of this motion, but it is undisputed that it was a defense motion that challenged the jurisdiction of the State of Ohio to prosecute the Petitioner. The Washington County, Court of Common Pleas in Ohio agreed with the Petitioner's contentions and dismissed the charge in Ohio.

It appears that the indictment in Ohio was dismissed on or about January 27, 1997. Other than a brief search of Sheree Petry's living quarters in Williamstown, Wood County, West Virginia, at or near the time her body being discovered in Ohio (May of 1996), there is no evidence in this proceeding of any other involvement of West Virginia law enforcement authorities up until the case was dismissed in Washington County, Ohio. In fact, during this search, Ohio law enforcement actually conducted the search with West Virginia law enforcement merely accompanying them.

Of course, once the Washington County, Ohio, charges were dismissed the authorities in West Virginia were forced to take up the case. There is absolutely no evidence of any prior involvement by West Virginia prosecutors or even West Virginia law enforcement prior to January 27, 1997.

The Petitioner also complains about the evidence in this case being transferred from the Ohio authorities to the West Virginia authorities without an exception to the warrant requirement

37

1066

being used. The warrant requirement would apply if a government agency (Ohio or Arizona law enforcement) seized personal property from a private citizen (the Petitioner). Here the Petitioner complains because one government agency (Ohio law enforcement) gave the Petitioner's property to another government agency (West Virginia law enforcement). The Petitioner cites no authority for his position that once law enforcement has lawful possession of a private citizens personal property that they are prevented from turning that property over to another law enforcement agency – even in another state.

Nevertheless, there were safeguards in place that allowed the Petitioner to test the legality of the property seized from him. The Petitioner was given the opportunity to challenge the legality of the initial taking of his property – both in Ohio and Arizona. Further, the Petitioner was able to challenge the admissibility of the property seized based upon the establishment of a proper chain of custody. To exclude this evidence based upon either the Arizona authorities or the Ohio authorities not complying with some state statute or case law would violate the spirit and purpose of the exclusionary rule.

The Petitioner next complains because the West Virginia authorities did not obtain a copy of the Washington County, Ohio, grand jury testimony of the witnesses who testified before the Grand Jury in Washington County, Ohio. The Wood County Prosecuting Attorney's Office asked for these transcripts and their request was denied by the Ohio authorities. The Petitioner filed a *pro se* Motion in Washington County, Ohio seeking production of these grand jury transcripts and this Motion was denied. The Washington County Public Defender Corporation also sought production of these transcripts and their request was denied. It was apparent that the Washington County Grand Jury transcripts were not going to be released.

The defense team cited no law at the trial level that would have allowed a Circuit Court

38

1067

Judge in Wood County, West Virginia to order the authorities in Washington County, Ohio to turn over these grand jury transcripts. The Petitioner has not cited any authority in this habeas corpus proceeding that would give a Circuit Court Judge in Wood County, West Virginia the jurisdiction to order the authorities in Washington County, Ohio to turn over the grand jury transcripts.

The Petitioner also raises the issue of ineffective assistance of counsel under this heading. The issue of ineffective assistance of counsel has been addressed, *supra*. For the reasons previously set out, this Court would FIND that the Petitioner has failed to establish that his trial counsel were ineffective.

This Court would FIND and CONCLUDE that the Petitioner has failed to establish any grounds for relief in habeas corpus under this heading.

## CHAPTER 6 - HEARSAY

Under this heading, the Petitioner complains about certain evidentiary rulings[2] that were made. Specifically, the Petitioner argues that the trial court erred in allowing hearsay and/or opinion testimony from Howard Rowsey, Cathy Rees, Stephanie Foutty and Lynn Noel.

With respect to Howard Rowsey, the Petitioner argues that the trial court permitted Howard Rowsey to testify as to the following:

> Petry said: "My friend Dennis (Rydbom) is coming."
> Howard said: "Oh, coming for a visit?"
> Petry answered: "No. He's coming here to go to school."
> Howard then asked, "Why?"
> Petry responded: "Well, I really don't know."
> Howard Rowsey asked, "Well is this guy your boyfriend?"
> Petry was very adamant in saying, "No, no way. He's not my boyfriend."

---

[2] The Supreme Court of Appeals of West Virginia approved revisions to the Rules of Evidence effective September 2, 2014. The language used in this section reflects the language of the Rules in effect at the time of the trial of the matter.

1068

A review of the trial transcript demonstrates that the following occurred during the State's direct examination of Mr. Rowsey:

[Conley]: Had you ever asked Sheree if her and Dennis were boyfriend and girlfriend?

[Rowsey]: I kidded around with her about it once in a while, and she would –

[Radcliff]: Objection, hearsay.

[Conley]: Your honor, this goes to the victim's mental state, because he asked her a direct question about it. He was teasing her about the relationship.

[The Court]: Yeah, but when in terms of the time? I mean, if –

[Conley]: I can clarify that.

[Rowsey]: Well, the one time I clearly remember was actually before he got here, and she had – she had said, 'My friend, Dennis, is coming."
And I said, 'Oh, coming for a visit?'
And she said, 'No. He's coming here to go to school.'
And I think my next questions was, 'why?'
And she said, 'Well, I really don't know.'
And then I said, 'Well, is this guy your boyfriend?'
And she was very adamant in saying, 'No, no way. He's not my boyfriend. He's just a friend.

(*See* Trial Transcript at 2255-2256)

Based upon this exchange, it is clear that defense counsel objected to this line of questioning based on hearsay. The State argued that it fell within the then-existing mental, emotional, or physical condition exception to hearsay pursuant to Rule 803(3) of the West Virginia Rules of Evidence.

Under Rule 803(3) of the West Virginia Rules of Evidence, "[a] statement of the declarant's then existing state of mind, emotion, sensation or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health) but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution,

40

1069

revocation, identification, or terms of declarants will" is not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness.

The Court would FIND that the statement does fall within the then existing state of mind exception to hearsay because it goes toward the victim's feelings toward the Petitioner and whether she had a relationship with him.

The Petitioner next argues that the trial court committed error by permitting Cathy Rees to testify as to the following:

> Cathy said, "Sheree, I think Dennis really loves you."
> Petry responded with a very agitated look & rolled her eyes.
> Cathy asked, "Well, Sheree, how do you feel about [Rydbom] following you across country again if you move?"
> Petry said, "Dennis needs to get a life. I'm not his lover, and I'm not his family, and he can't continue to follow me like this."

A review of the transcripts shows that the following exchange took place during Ms. Rees' direct-examination by the State.

> [Durig]: Now, later on in 1995 or in 1996, early in 1996, during the Christmas or in to the early part of January of 1996, do you recall having a conversation with Sheree Petry concerning your view of Mr. Rydbom's feelings toward her?
>
> [Rees]: Correct
>
> [Durig]: And when did that conversation – or where did that conversation take place?
>
> [Rees]: In her – at the Rowseys' house, in her apartment.
>
> [Durig]: All right. And were you and Ms. Petry alone at that time?
>
> [Rees]: Dennis had just left. He was there.
>
> [Durig]: And did you specifically say something to Ms. Petry concerning your view of how Mr. Rydbom felt about Ms. Petry?
>
> [Rees]: Yes I said —

41

1070

[Radcliff]: Object – I'll withdraw.

[Durig]: What did you say to her?

[Rees]: I said, 'Sheree, I think Dennis really loves you.'

[Durig]: All right. Now, at that time, did Ms. Petry say something to you which indicated her then existing mental state concerning her feelings for the defendant?

[Radcliff]: Objection as to the relevancy of that, the victim's – Sheree Petry's then existing state of mind concerning the defendant.

[The Court]: What was the time frame of this?

[Durig]: Around Christmas of '85 or early into '86.

[Radcliff]: '95.

[The Court]: '95.

[Durig]: '95. I'm sorry.

[The Court]: Okay. The objection is overruled. You may proceed.

[Durig]: All right.

[Durig]: What did Ms. Petry say to you concerning her feelings for Mr. Rydbom?

[Rees]: Well, the first thing she did, she just looked very agitated and rolled her eyes, and she didn't comment.
And I said, 'Well, Sheree, how do you feel about Dennis following you cross country again if you move?'
And she said, 'Dennis needs to get a life. I'm not his lover, and I'm not his family, and he can't continue to follow me like this."

(*See* Trial Transcript at 2567-2569)

It appears that defense counsel objected to this line of questioning based on relevancy and that the State sought to introduce this evidence based upon then-existing mental, emotional, or physical condition exception to hearsay. The victim's then existing feelings for Petitioner were relevant and admissible in light of the State's theory that Petitioner committed this murder

42

because he was stalking or obsessed with the victim.

The Petitioner next argues that the trial court committed error by permitting Stephanie Foutty to give her expert opinion that the relationship between the Petitioner and the victim was "one that —it seemed that Dennis may have been more of a friend or wanted the friendship more, just in that he seemed –he called her a lot more, you now, than maybe she called him sometimes."

A review of the trial transcript reveals that the following exchange took place during Ms. Foutty's direct examination by the State:

[Conley]: Did you ever spend time with Sheree Petry and Dennis Rydbom when they were together?

[Foutty]: Yes.

[Conley]: On numerous occasions?

[Foutty]: On, you know, some occasions. We were both – we were all three students at Marietta College. We'd run into each other at lunch. Sometimes we would plan – you know, there was a time when we'd plan to have lunch together. Just as college students tend to run into each other, you know, yes, I saw them together and, you know, the three of us had been together on occasions.

[Conley]: How would you describe the relationship between Sheree Petry and Dennis Rydbom?

[Radcliff]: Objection. There's no foundation.

[The Court]: I believe there's an adequate foundation at this point. You may answer the question.

[Foutty]: Okay. They had what I would believe to be as a typical friendship. They also studied together on occasions. There had been times where Dennis had helped Sheree with some things that she had to get done. I know on occasion he also borrowed her car or maybe she would take him some place. They had a typical, you know, friendship. It was one that – it seemed that Dennis may have been more of a friend or wanted the friendship more, just in that he seemed – he called her a lot more, you know, than maybe she called him sometimes. But, you know it was a typical friendship in that respect.

43

(*See* Trial Transcript at 1105-1106)

The Court would first FIND that Ms. Foutty was not called as expert nor found to be an expert by the Court. Further, under Rule 701, of the West Virginia Rules of Evidence a lay witness is permitted to give opinion testimony under certain circumstances. Pursuant to Rule 701, "[i]f the witness is not testifying as an expert, his or her testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.

In the present case, Ms. Foutty testified that she had seen Petitioner and the victim together on several occasions; therefore, the testimony was rationally based on the witness's perception. Further, her testimony was helpful to understand the relationship between the Petitioner and the victim, which was at issue. Therefore, Petitioner's argument that it was error to allow Ms. Foutty's opinion is not well taken.

Petitioner next argues that the trial court erred by permitting Stephanie Foutty to testify that the Petitioner and the victim had a conversation and that the victim's reaction was that it made the victim feel uncomfortable. The Petitioner argues that Ms. Foutty never claimed to have witnessed the conversation but that the prosecution presented the "conversation" as if Ms. Foutty knew about it personally.

The following exchange occurred during the direct examination of Ms. Foutty by the State:

> [Conley]: You've described the relationship between Sheree Petry and Dennis Rydbom. Do you recall about four weeks prior to Sheree's body being found having a conversation with her regarding that relationship?

44

1073

[Radcliff]: Objection. She's going to ask about the conversation, I imagine.

[The Court]: Well, I think she can answer whether she had the conversation or not. The question is: Did you have a conversation?

[Foutty]: Yes

[Conley]: And do you recall the impression you had regarding – well, do you recall that conversation?

[Foutty]: Not exactly, no.

[Conley]: Okay. Do you recall the gist of that conversation?

[Foutty]: Yes

[Conley]: And at that point, did – with regard to that conversation, did Sheree give you any indication about a change in the relationship between her and the defendant?

[Radcliff]: Objection, if it calls for the statement of Sheree Petry.

[Conley]: You've described –

[The Court]: Whoa, whoa.

[Conley]: Oh, I'm sorry, Your Honor. I was thinking ahead in my mind. I'm going to try and go ahead and go about this another way.

[The Court]: Okay

[Conley]: You've described the relationship between Sheree Petry and the defendant, Dennis Rydbom.

[Foutty]: Uh-huh.

[Conley]: Based on your observations of that relationship, did it seem to change over the time you knew the two of them?

[Foutty]: It did seem to change but in a natural manner to me, in that oftentimes you have some friendships that you eventually become more distant with, you grow apart. Sheree was very much looking forward to going to graduate school in Arizona, and I think that it was just then that she was ready to move on into a different stage of her lifetime.

So in regards to the question, I think that they began to grow apart, you

45

1074

know, in their friendship and that she didn't necessarily need the friendship quite as much. She was ready to move on to different stage or, you know, a different portion of her life.

[Conley]: And what do you base that on?

[Foutty]: Just in that it didn't seem to me that she spent as much time with him. She was very, very consumed with her school work. She was taking extra courses and was trying to get her requirements for graduation completed. She really didn't have a lot of extra time between work and school and, you know, just as in -- you know, it just -- they seemed to grow apart.

[Conley]: Ms. Foutty, could you be any more specific about anything that made you believe that they were growing apart in their relationship?

[Foutty]: They did have a conversation once that -- I don't remember her words specifically, so I can only tell you what her reaction to the conversation was and that it was a conversation that she had had with Mr. Rydbom, and that her reaction to the conversation was that based on the grounds of their friendship, the conversation made her feel uncomfortable.

[Radcliff]: Objection, Your Honor. She's reciting the words.

[The Court]: I'm sorry?

[Radcliff]: She is reciting Sheree Petry's words.

[The Court]: I didn't think that she was. I thought she said that her impression was that she was feeling uncomfortable, her observations. Is that not what she was saying?

[Conley]: I thought that's what she was saying.

[The Court]: Okay.

[Radcliff: I must have misheard.

[The Court]: Okay.

[Foutty]: It was her reaction that I said. Her reaction to the conversation was one based on their -- you know, the boundaries of their friendship. It was a reaction, that she felt uncomfortable. You know, I asked her what she was going to do about the comment that was made to her, and she said --

[Radcliff]: Objection

46

1075

[The Court]: Sustained.

[Conley]: That's fine. That's all the questions I have, Your Honor.

(*See* Trial Transcript at 1107-1111).

Under Rule 602 of West Virginia Rules of Evidence, "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the witness' own testimony."

The Court FINDS that defense counsel was diligent and objected to prevent Ms. Foutty from testifying as to what the victim might have told Ms. Foutty about the contents of the conversation the victim had with the Petitioner. The Court FINDS that Ms. Foutty only testified as to what she personally observed to be the victim's reaction when the victim was telling her about the conversation with the Petitioner. The Court would further FIND that Ms. Foutty only testified that the victim looked uncomfortable and in fact when she was about to say what the victim told her defense counsel's objection was sustained. Therefore, the Court FINDS no basis for the requested relief.

The Petitioner next argues that the trial court erred by permitting Lynn Noel to testify that the victim told her that Sheree was very concerned about what was going on with Rydbom; that Sheree didn't know what she was going do about it; that Sheree had told Rydbom in every way that she knew how that what she wanted was a friendship; that Rydbom did not seem to hear her or pay any attention to her; that Rydbom was becoming more and more insistent; that Sheree at this point in time plain did not know what to do; that Sheree guessed that she would try one more time to tell Rydbom that she just wanted to be friends, and; that, if Rydbom could not accept that, and if that wasn't what happened, that Sheree wouldn't be able to see Rydbom anymore.

47

1076

The trial transcript reveals the following exchange during Ms. Noel's direct examination by the State:

[Conley]: Okay. On that Thursday when you saw Sheree, as she was leaving your house I believe that you all had a conversation, or actually I don't' think it was a conversation. Sheree said some things to you?

[Noel]: Yes, she did.

[Conley]: Do you recall what she said to you?

[Radcliff]: Objection, hearsay.

[Conley]: Your Honor, this falls under the hearsay exception to 803(3). It goes to her mental state, and also it goes to the plan of what she was going to be doing as a result of the statements that were made.

[The Court]: Whose plan?

[Conley]: Sheree Petry's. She's the declarant.

[The Court]: Dale, if you could please escort the jury to their room.

\*\*\*

[Conley]: Ms. Noel, you had testified that Sheree Petry was at your house on Thursday. And as Sheree was getting ready to leave your house and as she stood at your door, she made some statements to you; is that correct?

[Noel]: She wasn't standing at the door. She was standing over by the counter. She was just preparing, you know, had said, 'I'm going to have to leave,' and was kding of getting herself together.

[Conley]: And at that time, did she make some statements to you?

[Noel]: Yes, she did.

[Conley]: Could you tell the jury what she said?

[Noel]: She started to talk, and she said that she didn't know what she was going to do about the relationship with Dennis, that it was – I don't – that it wasn't comfortable for her right now and that she had tried in every way that she knew how, using every expression she could, to let him know that she was interested in being friends, nothing more, and that he didn't seem to be able to hear her or go

48

along with what she said, and that he was becoming more and more insistent and it was becoming more and more uncomfortable for her, and that she really didn't know how she was going to handle it or what she was going to do about it. And she said that she guessed that she would try one more time to talk to him and tell him that she just wanted friendship, nothing more, and that if he couldn't go with that, that she didn't know what else to do other than to say she would not see him anymore.

(*See* Trial Transcript at 1175-1176; 1179-1180).

A review of the trial transcript also reflects that the Court conducted an *in camera* hearing prior to admitting the statement. After the *in camera* hearing, the Court found:

> Well, of course, one of the issues that needs to be determined is whether the declarant's state of mind is at issue, and I believe that it is, especially in terms of the plan, which the rule specifically provides for, such as intent, plan. It certainly goes to her existing state of mind at the time in that she planned doing things and the motive or the reason for such plan.
>
> It certainly must be – as Mr. Radcliff pointed out, it must not only meet the – I guess you could say the language of the rule, but it also must be relevant, and it must also go through a 403 analysis. And I believe that it is relevant because it goes to establish and help explain the reasons why they were together on Friday.
>
> I do not believe that the prejudicial weight outweighs the probative value. I think that it is very probative on the condition of the relationship at the time or at least close in time to the killing. And I'm not sure that there's really any other way that they can get to that, or the State can get to that evidence. So the Court will admit the statement, essentially what she said here, nothing more.

(*See* Trial Transcript at 1178-1179)

Based upon the above, the Court FINDS that Ms. Noel's testimony was properly admitted.

The Petitioner further argues that the right to confront witness was denied by the admission of the statements set out above.

> Under *Crawford* and this Court's decision in *Mechling,* only 'testimonial statements' cause the declarant to be a 'witness subject to the constraints of the Confrontation clause'. Non-testimonial statements by an unavailable declarant, on the other hand, are not precluded from use by the Confrontation Clause.

49

1078

*State v. Kaufman*, 227 W.Va. 537, 711 S.E.2d 607 (2011) (citing *State v. Mechling*, 219 W.Va. 366, 633 S.E.2d 311 (2006)).

> Under the Confrontation Clause contained within the Sixth Amendment to the *United States Constitution* and Section 14 of Article III of the *West Virginia Constitution*, a testimonial statement is generally, a statement that is made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.

Syl. Pt. 8, *State v. Mechling*, 219 W.Va. 366, 633 S.E.2d 311 (2006).

> Under the Confrontation Clause contained within the Sixth Amendment to the *United States Constitution* and Section 14 of Article III of the *West Virginia Constitution*, a witness's statement taken by a law enforcement officer in the course of an interrogation is testimonial when the circumstances objectively indicate that there is no ongoing emergency, and that the primary purpose of the witness's statement is to establish or prove past events potentially relevant to later criminal prosecution. A witness's statement taken by a law enforcement officer in the course of an interrogation is non-testimonial when made under circumstances objectively indicating that the primary purpose of the statement is to enable police assistance to meet an ongoing emergency.

Syl. Pt. 9, *State v. Mechling*, 219 W.Va. 366, 633 S.E.2d 311 (2006).

> Unlike testimonial out-of-court statements, nontestimonial statements may be admissible in a criminal trial if it is shown that the witness is unavailable for trial, and that the witness's statement bore adequate indicia of reliability *See* Mechling, 219 W.Va. at 371, 633 S.E.2d at 316. "Reliability can usually be inferred where the evidence falls within a firmly rooted hearsay exception."

*State v. Kaufman*, 227 W.Va. 537, 552, 711 S.E.2d 607, 622 (2011) (quoting Syl. Pt. 5, in part, *James Edward S.*, 184 W.Va. 408, 400 S.E.2d 843 (1990)).

The Court FINDS that none of the statements attributed to the victim that the Petitioner complains of are testimonial in nature. The Court FINDS that none of those statements were given to law enforcement. The Court further FINDS that none of those statements were made by the victim with the reasonable belief that they would be used at a later proceeding. Therefore, the

50

1079

statements are non-testimonial and as such can be admissible so long as the declarant is unavailable and there is indicia of reliability, which can be inferred where the statement falls within a firmly rooted exception.

In the present case, the Court has found that each of the statements attributed to the victim by Howard Rowsey, Stephanie Foutty, Catherine Rees and Lynn Noel were all properly admitted into evidence. As such, the Court FINDS and CONCLUDES that the statements were properly admitted and the Petitioner's ground for relief based on inadmissible hearsay or opinion evidence does not warrant relief in habeas corpus.

## CHAPTER 7 – SELF-INCRIMINATION

For the first 2 ½ pages of this topic, under the heading "Using Rydbom's Pre-Arrest Pre-Miranda Silence", the Petitioner discusses statements made to private individuals (or his silence in response to inquiries by private individuals), all at a time prior to the Petitioner being arrested (or a warrant being issued against the Petitioner). No citation to authority is needed for the proposition that the protections afforded citizens by the Constitution (either the state or federal) relate to state action. In other words, private citizens can question a person accused of committing a crime and the private citizen does not need to give Miranda warnings to the suspect. The same analysis applies to a suspect's silence in response to private citizens making inquiries of him or her.

There is no allegation that the private citizens discussed in this section of the Amended Petition were acting as agents of the government at the time of the discussions with the Petitioner. Even if they were acting as agents of the government when the private citizens were talking to the Petitioner in late May and early June of 1996, the protections afforded defendants for post-Miranda silence, and statements, are generally not available for pre-arrest silence. *State*

1080

*v. Oxier*, 175 W.Va. 760, 338 S.E.2d 360 (1985); *State v. Prophet*, 234 W.Va. 33, 762 S.E.2d 602 (2014).

The Petitioner next raises the issue of the scope of his cross-examination. It should be noted that the Petitioner did not testify at the jury trial that was held in January and February of 1998. With regard to the scope of cross-examination, the general rule is that the scope of cross-examination is limited to the topics raised on direct examination, plus issues affecting credibility. This general rule, however, does not apply to the Petitioner since he is a party to the proceeding.

> The scope of cross-examination of a party is governed by Rule 611(b)(1) of the *West Virginia Rules of Evidence* which provides that "[a] party may be cross examined on any matter relevant to any issue in the case, including credibility. In the interest of justice, the judge may limit cross-examination with respect to matters not testified to on direct examination." We previously have explained regarding application of this rule:
>
>> In applying Rule 611(b) of the West Virginia Rules of Evidence, the circuit court has considerable discretion to determine the proper scope of cross-examination, after weighing such factors as the importance of the evidence to the prosecution's case, the relevance of the conduct to the witness's truthfulness, and the danger of prejudice, confusion, or delay raised by the evidence sought to be adduced. It is a well settled rule that a defendant who voluntarily offers himself as a witness and testifies in his own behalf subjects himself to legitimate and pertinent cross-examination to test his veracity and credibility. Thus, by deciding to testify in a West Virginia criminal trial, a defendant brings into play the rules designed to implement the truth-finding process, i.e., cross-examination.
>
> *State v. Bradshaw*, 193 W. Va. 519, 540-41, 457 S.E.2d 456, 477-78 (1995) (footnotes omitted). Moreover, we have recognized that Rule 611(b)(1) "by its very terms encourages wide-open cross-examination when a party is a witness unless the defendant can demonstrate that literal application of the rule would create an unjust situation." *Bradshaw*, 193 W. Va. at 541 n.30, 457 S.E.2d at 478 n.30.

*Prophet*, W.Va. at 42-43, S.E.2d at 611-12.

52

1081

There can be limits placed on the cross-examination of a party, but the party seeking to limit the scope of cross-examination has the burden of asking for limits and must provide reasons for any modifications of the general rule. While the Petitioner asked that the cross-examination of him be limited through the filing of a Motion to Preclude Cross-Examination of Defendant on Matters Outside the Scope of Direct Examination, the Petitioner did not specify the topics to be limited or the reasons for limiting cross-examination.

This Motion was heard on January 8, 1998, and the Petitioner provided the Court no insight into what issues he would be discussing on direct examination or what topics or issues he did not want raised in cross-examination. Without some idea as to what topics the Petitioner wanted to keep the State of West Virginia from examining him on, it was impossible for the Court to grant the Petitioner's Motion.

The likely reason the Petitioner did not chose to reveal this information is set out on page 72 of the Amended Petition – ". . . defense counsel would had to have tipped their hand, in advance, as to what topic(s) the defendant would testify to, . . .". As can be clearly seen by this statement, the decision not to state the topics upon which the defense wished to limit cross-examination of the Petitioner was a matter of trial strategy. Upon this strategy not being effective at the trial level, the Petitioner now wants a second chance, most likely with a different strategy. This is simply not allowed.

The next topic raised under the general heading of "Self-Incrimination" is the allegation that certain statements made by the State of West Virginia during its closing argument to the jury inappropriately alluded to the Petitioner's decision to not speak to law enforcement and to not testify at trial.

The general rule formulated for ascertaining whether a prosecutor's
comment is an impermissible reference, direct or oblique, to the silence of the

53

accused is whether the language used was manifestly intended to be, or was of such character that the jury would naturally and necessarily take it to be reminded that the defendant did not testify. (citations omitted)

*State v. Murray*, 220 W.Va. 735, 741, 649 S.E.2d 509, 515 (2007) citing *State v. Swafford*, 206 W.Va. 390, 524 S.E.2d 906 (1999).

Four factors are taken into account in determining whether improper prosecutorial comment is so damaging as to require reversal: (1) the degree to which the prosecutor's remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the accused; and (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters.

*State v. Murray*, 220 W.Va. 735, 739-40, 649 S.E.2d 509, 513-14 (2007) citing *State v. Sugg*, 193 W.Va. 388, 456 S.E.2d 469 (1995).

The above quote from *Swafford* is tempered by the following language:

the prosecution is free to stress the strength of the government's case and to argue the evidence and reasonable inferences therefrom, and the prosecutor is not constitutionally forbidden from telling the jury the fact that the evidence on any given point in the case stands uncontradicted. A prosecutor's statement that the evidence is uncontradicted does not "naturally and necessarily" mean the jury will take it as a comment on the defendant's failure to testify. In many instances someone other than the defendant could have contradicted the government's evidence.

*State v. Hillberry*, 233 W.Va. 27, 33, 754 S.E.2d 603, 609 (2014) citing *State v. Clark*, 170 W.Va. 224, 292 S.E.2d 643 (1982).

With these standards in mind, each statement attributed to the State will be reviewed:

1. "But let's look briefly at the past, at the relationship between the defendant in this case, Dennis Rydbom, and Sheree Petry. We don't know all that much about it, except we know that they met in Arizona." This statement is not that damaging and certainly not a comment about the Petitioner not testifying. Further, in context, this statement is even more benign. This

54

1083

statement comes at the end of an argument by the State that reviews the evidence about the relationship between the Petitioner and the victim. It is simply a statement about the evidence in the case.

2. "What does Kevin McGann find? Women's underwear . . . Yeah, women's underwear, Why? Why?" This is not the full quote but the part left out is not that important. However, again, in context, this statement was just an explanation as to why law enforcement from Marietta, Ohio went to Arizona.

3. "They also find pictures of tombstones. Again, ladies and gentlemen, it is for you to interpret that evidence, but that is the evidence. Why? Why? They were only friends." This statement is also taken out of context. This is part of a review of the evidence by the State as to what was found (and not found) when a search of the Petitioner's home in Arizona was conducted. The State pointed out the following evidence was found: books about death; a poem about death wrapped around the victim's business cards; notes and cards from Sheree; a notebook with Sheree's business card; pictures belonging to the victim and pictures of tombstones. In context, the State is simply arguing why was this in the possession of the Petitioner if he and the victim were only friends.

4. "I mean, that what he says he did, that he got all this stuff (lingerie) out there. Now, that leads to the obvious question: Why? Why? Well, that question the State has no explanation for, except one. It's not true." This is not a statement about the Petitioner not testifying or his silence. In fact it is based upon a statement the Petitioner made to law enforcement. It is simply a comment on the defense theory of the case, and the State's position that this theory is not true.

5. State's Exhibit 23. This is not a statement about the Petitioner not testifying or his silence. In fact it is based upon a statement the Petitioner made to law enforcement. It is simply

55                                                                                        1084

a comment on the defense theory of the case.

6. through 11. Dealing with State's Exhibits 24, 19, 25, 20, 26 and 30. Again, this is not a statement about the Petitioner not testifying or his silence. This is based upon a statement that the Petitioner made to law enforcement that he started to collect this lingerie in Arizona, after the death of Sheree Petry. So these statements about these State's Exhibits is an analysis of the State's theory of the case versus the defense theory of the case.

All these statements about the women's lingerie (State's Exhibit 23, 24, 19, 25, 20, 26 and 30) are made as the State is reviewing the evidence and indicating that these particular pieces were identified by witnesses for the State as belonging to the victim, yet they were found in the possession of the Petitioner.

12. "We have an explanation that for some unknown reason, upon going to Arizona, this gentleman decides it would be appropriate to start collecting women's lingerie." Again, this is the State arguing its theory against the defense theory of the case.

13. "There was only one other person who ever lived on the face of this earth who could tell you what happened that Friday night. She's not available." This statement is again taken out of context. This statement is made in the State's review of the evidence and recount of what happened Friday night – according to the Petitioner through statements he made to friends and a statement he made to law enforcement in Arizona. This is certainly not a comment on the Petitioner's silence because it is based upon his statements.

14. "But who says he rode his bike?" This is not a comment on the Petitioner not testifying or his silence. This is argument or analysis of the State's theory of the case versus the defense theory of the case.

15. "Who says he rode his bike . . . Who says he got there after Sheree died? I don't."

56

1085

This is not a comment on the Petitioner not testifying or his silence. This is argument or analysis of the State's theory of the case versus the defense theory of the case.

16. "Who says that he then immediately took her to the sewer and dumped her body? Who says it?" This is not a comment on the Petitioner not testifying or his silence. This is argument or analysis of the State's theory of the case versus the defense theory of the case.

17. "Who says he rode the bike? He had access to the car." This is not a comment on the Petitioner not testifying or his silence. This is argument or analysis of the State's theory of the case versus the defense theory of the case.

Also, quotes 14, 15, 16 and 17 were directed toward the defense re-enactment and time line. The defense re-enactment assumed certain facts and all the State is arguing was why should those assumptions be considered accurate.

18. "The fact of the matter is . . . the defendant had the victim's lingerie, and there is no explanation for it, except for that." This is not a comment on the Petitioner not testifying or his silence. The Petitioner gave a statement to law enforcement that he started to collect this lingerie after he went to Arizona after the death of Sheree Petry. So clearly this is not a comment on the Petitioner's silence. This is argument or analysis of the State's theory of the case versus the defense theory of the case.

19. ". . . this is the question that's run through my mind since the beginning of it. Just ask yourself – your best friend's been murdered. You know the police want to speak with you, and you choose not to help them. You need to ask yourself why someone would do that." This is an argument based on the Petitioner's pre-arrest silence.

What also needs to be kept in mind in evaluating these statements is that the Petitioner presented a vigorous defense in this case. Approximately 24 witnesses were called for the

57

1086

defense (in addition to cross-examination of the State's witnesses) and the defense lasted 4 days. So, this is not a case where the defense presented no evidence and the only evidence before the jury was the State's. When these statements are placed in context, and keeping in mind that the State is entitled to argue reasonable inferences and to emphasize the strength of its case, all these arguments by the State were proper.

The Court therefore FINDS and CONCLUDES that the Petitioner is not entitled to relief in habeas corpus based upon this ground for relief.

## CHAPTER 8 – PREJUDICIAL PRETRIAL PUBLICITY

The first issue raised under this heading is the number of newspaper articles and TV broadcasts that occurred prior to, and during, the trial of this case. The Petitioner alleges that over 120 newspaper articles, and just as many TV broadcasts, occurred during this time period. The Petitioner also alleges that many of these were maliciously false.

The evidence at the evidentiary hearing established that 74 newspaper articles were published in West Virginia newspapers. This Court will concede that there may be just as many newspaper articles in Marietta, Ohio, during this time period, given that the body was found in Marietta and the Petitioner was first charged in Washington County, Ohio. The problem the Petitioner is having however, with this ground for relief, is the showing that any members of the jury panel who ultimately decided this case were affected by this publicity.

The Petitioner complains that both newspaper articles and television broadcasts cast him in a bad light. Interestingly, though, the Petitioner never alleges that the trial jurors were affected by this pre-trial or trial prejudicial publicity. That is, of course, the important consideration. The fact that there may have been pre-trial publicity and/or the fact that the pre-trial publicity may

58

have been prejudicial to the defendant is of no moment if fair and impartial jurors can be seated to try the case.

A similar issue was raised in *State v. Payne*, Slip Opinion No. 15-0289, Filed October 19, 2016. In denying relief to the Defendant, the Supreme Court of Appeals of West Virginia restated the law with regard to pretrial publicity:

> It has long been the law in this state that "[t]o warrant a change of venue in a criminal case, there must be a showing of good cause therefor, the burden of which rests on the defendant, the only person who, in any such case, is entitled to a change of venue. The good cause aforesaid must exist at the time application for a change of venue is made. Whether, on the showing made, a change of venue will be ordered, rests in the sound discretion of the trial court; and its ruling thereon will not be disturbed, unless it clearly appears that the discretion aforesaid has been abused." Syl. pt. 2, *State v. Wooldridge*, 129 W.Va. 448, 40 S.E.2d 899 (1946).

> Syl. Pt. 2, *State v. Williams*, 172 W.Va. 295, 305 S.E.2d 251 (1983). Importantly, "[w]idespread publicity, of itself, does not require change of venue, and neither does proof that prejudice exists against an accused, unless it appears that the prejudice against him is so great that he cannot get a fair trial." Syl. Pt. 1, *State v. Gangwer*, 169 W.Va. 177, 286 S.E.2d 389 (1982). Moreover, a change of venue will not be granted unless "a present hostile sentiment against the accused, extending throughout the entire county in which he is brought to trial[,]" is shown. Syl. Pt. 1, in part, *State v. Peacher*, 167 W.Va. 540, 280 S.E.2d 559 (1981) (quoting Syl. Pt. 1, *State v. Siers*, 103 W.Va. 30, 136 S.E. 503 (1927)).

*Payne* at 29-30.

The Court in *Payne* went on to clarify: "Indeed, "one of the inquires on a motion for a change of venue should not be whether the community remembered or heard the facts of the case, but whether the jurors had such fixed opinions that they could not judge impartially the guilt or innocence of the defendant." Syl. Pt. 3, *State v. Derr*, 192 W.Va. 165, 451 S.E.2d 731 (1994)." *Payne* at 30. While the Petitioner may be correct that there were numerous newspaper

59

1088

articles and television broadcasts concerning his trial, the connection that is lacking in the Petitioner's proof is that this publicity affected the jurors who tried this case. There is no evidence that this occurred.

There is an old saying that the best way to determine if a motion for a change of venue should be granted is to try to select a jury. In this case a jury was selected. Again, the Petitioner makes no allegations that any particular juror that was on the jury panel should not have been allowed to sit on the jury due to that particular jurors answers about pre-trial publicity.

Given that there was no allegation (or proof) that the trial jurors were affected by the pretrial publicity, or that any of the trial jurors saw, read or heard any of the information contained in the news media during the trial, the Petitioner is not entitled to any relief in habeas corpus on this claim.

The Petitioner next raises the issue of a "perp-walk" by him. However, this issue cannot be decided on allegations in the Petition or the Amended Petitions. This issue must be decided on the evidence before the Court. The evidence before the Court is that the issue of some of the jurors seeing (or at least potentially seeing) the Petitioner being walked from the jail to the courthouse in shackles was first raised on January 14, 1998, and then again on February 5, 1998. The trial started on or about January 6, 1998.

The Petitioner's trial counsel, Bruce White, testified at the evidentiary hearing on November 9, 2016. He stated that at the time of the trial in this matter in 1997-98 that he had been practicing criminal law for at least 3 years in Wood County. During this 3 year period of time, he had not had this issue (jurors seeing defendants being walked from the jail to the courthouse) come up, nor had he heard of this issue being raised by any other defense counsel. Therefore, the only evidence before this Court is the fact that jurors seeing a criminal defendant

60

1089

being brought from the jail to the courthouse in shackles was an issue of first impression. As can be seen from the trial transcript (*See*, pages 1438-39 of the trail transcript), when this issue was first raised with the trial court, a reasonable accommodation was reached. The reasonable accommodation was that the Petitioner would be driven from the jail to the back of the courthouse, instead of being walked across the street. There was no request for a mistrial, a curative instruction, or any other relief (either legal relief or relief in the form of other accommodations for getting the Petitioner from the jail to the courthouse).

The next time this issue was brought to the Court's attention was on February 5, 1998, during the jury's deliberation. Again, when this issue was brought to the Court's attention, a discussion was had between counsel and the Court in an attempt to remedy any prejudice that may attach to the Petitioner as a result of this conduct. (*See*, pages 3598-3601 of the trial transcript) Again, a reasonable accommodation was reached, and there was no objection to the procedure that was agreed to, nor was there a motion for a mistrial, a curative instruction or request for any other relief.

In a further attempt to make sure that the Petitioner had not been prejudiced by some of the jurors seeing the Petitioner being escorted between the jail and the courthouse in shackles, once the jury returned their verdict, the jury was asked whether any of them had seen the Petitioner being escorted in shackles. As shown on pages 3654 through 3656 of the trial transcript, four jurors saw the defendant being escorted in shackles. Upon being questioned, none of the four indicated that this affected their decision in this case.

A similar situation occurred in the trial of Patrick Meckling, as detailed in his habeas corpus appeal, *Ballard v. Meckling*, 235 W.Va. 109, 772 S.E.2d 208 (2015). At the trial level, Meckling was taken into custody during a recess. At least one of the jurors saw Meckling being

61

1090

taken into custody and being handcuffed. Meckling was ultimately convicted. In his habeas proceeding, Meckling raised this issue and the conviction was overturned by the trial court. In reversing this action, the Supreme Court of Appeals of West Virginia cited *State v. Linkous*, 177 W.Va. 621, 355 S.E.2d 410 (1987) for the proposition that: "Ordinarily, it is not reversible error nor grounds for a mistrial to proceed to try a criminal defendant with a jury panel that may have seen him in handcuffs for a brief period of time prior to trial." Syllabus Point 2, *Linkous*. In addition to citing this Syllabus Point from *Linkous*, *Meckling* created a new Syllabus Point which states: "Ordinarily, it is not reversible error nor grounds for a mistrial to continue to try a criminal defendant after one or more jurors may have seen the defendant in handcuffs for a brief period of time after the trial has begun. Syllabus Point 3, *Ballard v. Meckling*. The decision in *Meckling* also cites to other cases from other jurisdictions that support this holding.

In fact there appears to be a subtle, yet important, distinction between seeing a criminal defendant in the courtroom in shackles and being seen outside the courtroom in shackles. As the Court in *Meckling* stated, citing *State v Swopes*, 343 S.W.3d 705 (Mo. App. W.D. 2011):

> A brief, inadvertent exposure of the jury to a handcuffed defendant while [the] defendant is being escorted from one place to another does not deprive [the] defendant of a fair trial. This is so because it is a normal and regular, as well as a highly desirable and necessary, practice to handcuff prisoners when they are being taken from one place to another, and the jury is aware of this. Thus, a brief, inadvertent exposure to the jury of a handcuffed defendant does not deprive the defendant of a fair trial and cannot be said to result in prejudice. As such, even if jurors did briefly observe the appellant in handcuffs, as claimed, we find no prejudice to him from this fact.

*Meckling* at 114 and 213, citing *State v. Swope*, 343 S.W.3d 705, 709-10 (Mo. App. W.D. 2011) (internal quotations and citations omitted).

It should be noted that the Petitioner in this case does not allege that he was forced to wear any type of physical restraints during the trial or even in the courtroom. Nor is there any

62

1091

allegation that he was in prison or jail garb. The only complaint is that some of the jurors saw him being brought between the jail and the courthouse in shackles and / or handcuffs.

The record in this case reflects that at the time of the trial in this matter, that the Petitioner had been convicted of armed robbery in Arizona (having spent 5 years in prison for this offense) (*See*, transcript of January 31, 1997, bond hearing). Further, the Petitioner was charged in December of 1997, by way of warrant, with an offense that ultimately lead to an Indictment for the offense of Malicious Assault Upon a Correctional Officer. Therefore, some type of restraint was both reasonable and necessary while transporting the Petitioner back and forth between the jail and the courthouse.

Based upon the above, this Court would FIND that 4 of the jurors saw the Petitioner being brought from the jail to the courthouse and sometimes being shackled. The Court would further FIND that this was inadvertent, in that the only evidence in this habeas proceeding is that this was the first time that a criminal defendant was seen being brought to the courthouse in shackles. The Court would also FIND that this was for a brief period of time - the time it takes to walk across the street. Further, that after it was brought to the attention of the Court on January 14, steps were taken to remedy the situation. After January 14, the only sighting possible of the Petitioner in any type of restraints was for a few steps (being taken from a cruiser to the back door of the courthouse). The Court therefore CONCLUDES that this brief and inadvertent exposure did not deprive the Petitioner of a fair trial and does not warrant relief in habeas corpus.

Toward the end of this Chapter on Prejudicial Publicity, the Petitioner alleges various issues. Each such issue will be addressed.

The Petitioner alleges that on January 8, 1998, that a reporter for the local TV station,

1092

WTAP, talked with some of the jurors. The Petitioner further alleges that his trial counsel failed to protect him by failing to inquire into what had transpired.

While the trial record suggests that some type of communication occurred, it also reflects that the reporter somehow became aware of the concern and addressed it with the Court. Also, the Court gave the Petitioner the opportunity to delve into the issue more and the offer was not accepted. (*See*, pages 761-764 of the trial transcript).

What is fatal to the Petitioner's allegations in this habeas corpus proceeding is that the record in the case *sub judice* is devoid of any evidence concerning this matter. Prejudice or ineffective assistance of counsel cannot be presumed. In fact, the opposite is true, there is a presumption of regularity in court proceedings and this presumption will not be overcome without proof or evidence of the same. *State ex rel. Scott v. Boles*, 150 W.Va. 453, 147 S.E.2d 486 (1966).

The Petitioner next alleges that this same reporter declared on an evening TV broadcast that the Petitioner was guilty. During the November 9, 2016, evidentiary hearing, after some wrangling with the local news station, no evidence of this declaration was found. Therefore, there is no evidence that such a statement was made.

The Petitioner next alleges that the sentencing hearing was continued for 10 weeks over his objection. There is no allegation of anything prejudicial to the Petitioner occurring during this period of time or as a result of this delay. Therefore, it is unclear why this allegation was made. Nevertheless, and not reflected in the record, the reason for this delay was two-fold. First, it was this Court's belief that regardless of the charge, that there needed to be a presentence report prepared before someone could be committed to the custody of the Division of Corrections. Second, the delay was to allow trial counsel to file post-trial motions and to have

64

1093

the motions heard and ruled upon.

Yet again the Petitioner alleges that throughout the trial local newspapers reported on the trial and made certain statements that were false or prejudicial. The Petitioner also alleges that the defense requested to poll the jury during the trial to determine if any of the jurors had seen any of this false or prejudicial news reporting and that it was error for the trial court to not conduct such a poll.

Again, the Petitioner does not cite to any newspaper articles that were published during the trial that were false or misleading.

It is accurate to state that during the trial, on January 27, 1998, trial counsel for the Petitioner asked the Court to poll the jury to see if any members of the jury had seen or heard any of the information set out in the press during the trial. Not having a factual basis to support this request, the Court declined to question the jurors.

The Court did, however, at the end of every trial day, and most days at the noon break, remind the jurors not to gather any information about the case outside of the courtroom.[3] This was in addition to the cautionary instruction given at the beginning of the trial that advised the jury that the only information they were to consider about this case was to come from the evidence presented in the courtroom, and not to listen to any news media broadcast or read any news articles about the trial.

Given that there was no evidence presented that any of the newspaper articles published during the trial were false or misleading, and given that there was no evidence that any of the jurors saw any newspaper articles that were published during the trial and further given the cautionary instructions given to the jurors, the Petitioner is not entitled to any relief on this claim.

---

[3] See trial transcript at pages 82, 316-317, 656, 759, 763, 1009-1010, 1100, 1223, 1323, 1438, 1703, 1829, 2033, 2265, 2336, 2469, 2513, 2546-2547, 2761, 2886, 3028, 3234, 3365, 3583, 3597, and 3609.

1094

The last item raised under this Chapter is inartfully worded to the extent that it is not possible to determine what is alleged. If it is a claim based on ineffective assistance of counsel for not introducing all the newspaper articles and video clips about this case, this claim would fail because the Petitioner would have the burden to introduce all those articles and video clips in this proceeding and to further show some prejudice or harm.

Based upon the above, the Court would FIND and CONCLUDE that the Petitioner has failed to show that he is entitled to relief in habeas corpus under this heading.

## CHAPTER 9 – PARTISAN JUDGE

In essence, the Petitioner has taken all his complaints and has restated them in one chapter and titled it: Partisan Judge. As has been shown in this Opinion and Order, there is no error that would allow for relief in habeas corpus. Therefore, restating them in a manner to allege an impartial judge gets the Petitioner no closer to relief in habeas corpus than when they were alleged under some other heading. Having addressed all the allegations previously, there is nothing else to decide under this heading.

It is therefore accordingly ORDERED that the Petitioner is not entitled to any relief in habeas corpus based on the allegations under the heading "Partisan Judge".

## CUMULATIVE ERROR

At the conclusion of the evidentiary hearing on November 9, 2016, the Petitioner wanted to add, as a ground for relief, the concept of cumulative error. The Respondent had no objection to this ground for relief being added.

The Court would FIND, as set out in the previous sections of this OPINION AND

1095

ORDER, that there was no error. Further, the Petitioner failed to make any argument in his subsequent pleadings / briefs on this ground for relief. Therefore, a ground for relief based upon cumulative error must fail.

## CONCLUSION

For the reasons set out above, this Court FINDS and CONCLUDES that the Petitioner is not entitled to relief in habeas corpus on any grounds he has asserted and properly argued in his various Petitions and Amended Petitions filed in this case.

It is therefore accordingly ORDERED that this case be Dismissed and removed from the docket of this Court.

The Clerk is to provide a copy of this Opinion and Order to the Petitioner, to stand by counsel and to the Wood County Prosecuting Attorney's Office.

12-22-16

ENTER

JEFFREY B. REED, JUDGE

67

1096